Margaretha Thompson, Plaintiff-Appellee, v. Fidelity and Casualty Company of New York, Defendant-Appellant.

### Gen. No. 11,071.

Second District, Second Division.
January 24, 1958.
Rehearing denied March 6, 1958.
Released for publication March 6, 1958.

160

Miller, Thomas, Hickey & Collins, of Rockford (William E. Collins, of counsel) for appellant.

Bernard P. Reese, Jr., of Rockford (Bernard P. Reese, Jr., of counsel) for plaintiff-appellee.

JUSTICE WRIGHT delivered the opinion of the court.

This is an appeal by the defendant from a judgment entered by the Circuit Court of Winnebago county in the sum of $25,000 in favor of the plaintiff. The case was tried before a jury and at the conclusion of all of the evidence, the court directed a verdict in favor of the plaintiff in the sum of $25,000 and entered judgment upon the verdict.

The facts as alleged in plaintiff's complaint, briefly summarized, in substance are as follows: First, that the plaintiff, Margaretha Thompson, was the beneficiary under two policies of insurance issued by the defendant, Fidelity and Casualty Company of New York, in the sums of $18,750 and $6,250 respectively. Second, that on November 17, 1955, Robert J. Caruth, at that time the husband of the plaintiff, purchased the two policies of insurance from a vending machine at the Boeing Air Field, Seattle, Washington, immediately prior to embarking on a plane operated by Peninsular Air Transport Company scheduled to leave at 8:00 o'clock p. m. Third, that the said Robert J. Caruth purchased a ticket for an air line trip which was scheduled to leave Boeing Field at 8:00 o'clock

p. m., but which was delayed until 12:00 o'clock midnight of November 17, 1955. Fourth, that by the terms of said insurance policies, the defendant contracted to pay to the beneficiary the sum of $25,000 in the event of the death of Robert J. Caruth while engaged in and as a result of the air trip covered by the air line ticket. Fifth, that the said aircraft did in fact take off from Boeing Field at or about 12:00 o'clock midnight on said date with Robert J. Caruth as a passenger. Sixth, that the said aircraft crashed on take off and as a result thereof Robert J. Caruth was killed, and that plaintiff made proper demand but defendant refused to pay the sum of $25,000.

The answer, as amended, filed by the defendant admitted: First, that Robert J. Caruth was a passenger on the Peninsular Aircraft which took off from Boeing Field at about midnight November 17, 1955, and that said aircraft crashed and caused his death, Second, that the beneficiary gave proper notice and that the defendant refused to pay. Concerning the allegation that the defendant contracted to pay the beneficiary $25,000 in the event of the death of Robert J. Caruth, defendant averred that it did not so contract; but on the contrary, the insuring clause of the policies limited coverage to a trip taken by the insured "after the purchase of this policy on Aircraft Operated by a Scheduled Air Carrier as defined" in the policies and that the definition of an aircraft operated by a scheduled air carrier did not include, and specifically excluded, aircraft operated by Peninsular Air Transport.

Plaintiff filed a reply to this answer denying that Peninsular Air Transport Company was not a scheduled air carrier and denying that Peninsular Air Transport was recognized, designated and determined, as an irregular or non-scheduled air carrier. The pleadings set out above presented the essential issues

decided by the trial court which are now before this court for review.

Most of the facts were either admitted in the pleadings, stipulated during the trial, or established by uncontroverted evidence. The evidence reveals that on November 17, 1955, Robert J. Caruth was at the Boeing Air Field in Seattle, Washington. There he purchased, through a vending machine, two insurance policies in the amounts heretofore stated, one at 3:42 o'clock p. m. and the other at 3:47 o'clock p. m. That thereafter, the said Robert J. Caruth purchased a ticket for an air trip, which was sold to him through an agency, and boarded a DC-4 aircraft operated by Peninsular Air Transport Co., which aircraft took off from Boeing Field about seven miles south of Seattle, at around midnight, crashing on take off and killing Caruth. Peninsular Air Transport Company was in November of 1955, at the time of the occurrence in question, a partnership owned by William Roy Robinson and Howard Bert Robinson, having its principal operation and maintenance base at Miami (Fla.) Air Transport, Hanger No. 1. It operated four aircraft and operated them under a Letter of Registration from the Civil Aeronautics Board and an Operating Certificate from the Civil Aeronautics Administration under Part 42 of the Civil Air Regulations. Peninsular Air Transport Company did not maintain scheduled flights, file schedules and tariffs for any regular passenger service, nor hold itself out as maintaining any regular schedule or flights.

The aircraft in question left Miami on November 13th, 1955, and flew without passengers to Richmond, Virginia. It then flew to Tacoma, Washington, under a Military "CAM" Flight. From that point it proceeded without passengers from Tacoma to Boeing Field, Seattle, Washington, arriving on November

163

14th, 1955. The aircraft was not at the time of the crash, owned, operated or chartered by the United States Government. When the aircraft arrived at Boeing there were no flights for it. It left Boeing Field on November 17, 1955, on a flight that was composed of 100 per cent military troops, which, however were individually ticketed passengers. On this fatal flight that left Seattle on November 17th, the passengers might have been under orders, might have been on furloughs, or might have been enroute for any number of reasons. A prospective passenger on this type of flight is given an agency ticket, which is exchanged for a carrier ticket. Peninsular Air Transport sold all of its tickets through agencies. Sometimes these tickets stated the hour of departure and sometimes they did not. If an agency was unable to sell sufficient tickets to make a pay load, Peninsular was not obligated to take off and had the prerogative of cancelling the flight. William Roy Robinson, one of the partners of Peninsular Air Transport Co., testified that he believed there was something on the carrier ticket which stated that it was not a scheduled carrier and to his knowledge this was true of Peninsular Air Transport. The evidence is conflicting as to the exact time set for take off. The specific time set for take off was delayed because of weather. However, the aircraft did in fact take off shortly before midnight. An irregular air carrier sometimes gets only a few hours' notice of a flight. On the date of the crash, Peninsular had no regularly scheduled flights from Boeing Field to any other point in the United States. The routes flown by Peninsular are not exactly the same as those flown by scheduled air lines.

It is the defendant's theory that the only issue involved in this case is whether the insured was a passenger on an aircraft operated by a "scheduled air carrier" as defined in the policy. Further, it is urged

by the defendant that the undisputed evidence shows that the insured was not a passenger on an aircraft operated by a scheduled air carrier, and the trial court should have directed a verdict for the defendant.

For a determination of this cause, we quote below the portions of this policy pertinent to the issues.

It commences with the following words printed in capitals and in type roughly twice the size of the ordinary type in the body of this policy:

"DO NOT PURCHASE MORE THAN A TOTAL OF $62,500 PRINCIPAL SUM—NOR FOR TRAVEL ON OTHER THAN SCHEDULED AIR CARRIERS. . . ."

The next sentence reads:

"I hereby apply to Company named below for Scheduled Air Carrier Trip (Airline Trip) Insurance . . ."

The next pertinent provision is:

"2. INSURING CLAUSE: Ticket or Pass Requirement. The Company will pay the benefits specified below if . . . the Insured suffers loss . . . sustained under circumstances specified below . . . after the purchase of this policy on Aircraft Operated by a Scheduled Air Carrier as defined below . . . provided that at the time that the Insured sustains such injury he is traveling on a transportation ticket or pass covering the whole of said airline trip issued to him for transportation on an aircraft operated by a scheduled air carrier."

There follows this paragraph, the first clause of which is printed in bold face capitals and in type double the ordinary type:

"6. DEFINITION OF AIRCRAFT OPERATED BY A SCHEDULED AIR CARRIER. The words 'Aircraft Operated by a Scheduled Air Carrier' as used in this policy, mean and are defined as follows: (1) aircraft of United States registry, operated on a regu-

165

lar, special or chartered flight by a scheduled air carrier holding a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board of the United States of America, or its successor, and which in accordance therewith files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities at regular and specified times, or (2) aircraft of foreign registry operated on a regular, special or chartered flight by a scheduled air carrier holding a certificate, license or similar authorization for scheduled air carrier transportation by the country of the aircraft's registry, and which in accordance therewith files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities at regular and specified times, or (3) aircraft of United States registry operated on a regular scheduled flight solely within the boundaries of a State of the United States by a scheduled air carrier legally authorized to conduct such operation, and which files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities solely within the boundaries of such State at regular and specified times. Specifically excluded from the above definition of 'Aircraft Operated by a Scheduled Air Carrier' are any and all aircraft operated by scheduled military airlines and any and all aircraft operated by air carriers recognized, designated, licensed or determined by the governmental authority having jurisdiction over civil aviation as being irregular or non-scheduled air carriers."

Between the Insuring clause and the above Definition clause, all appearing on the first page of the policy, is the following clause:

"5. DEFINITION AND DELIMITATION OF COVERAGE. This policy applies only to such injury . . . (a) while boarding, riding as a passenger in,

alighting from or coming in contact with an aircraft operated by a scheduled air carrier as defined below: or (b) while riding in or on a land conveyance provided or arranged for . . . by such scheduled air carrier . . .; or (d) in consequence of exposure as the result of a forced landing of, accident to, or disappearance of aircraft operated by a scheduled air carrier . . . ."

Although the law of the State of Washington applies to the case at bar, the plaintiff and defendant both agree that it does not differ materially from the law of Illinois concerning the reasons governing interpretation and construction of insurance contracts and contracts in general. This is so agreed to by counsel in their respective briefs and both cite principally Illinois authorities and authorities from other jurisdictions.

■ The rule of liberal construction of insurance policies in favor of the insured must yield to rules of reasonable construction, and the rule construing ambiguous provisions strictly against the insurer will not permit perversion of plain language to create an ambiguity where none in fact exists. This rule was recognized recently by this court in Maryland Casualty Co. v. Holmsgaard, 10 Ill.App.2d 1, 8, 10, 133 N.E.2d 910, 913, 914, wherein it was stated:

". . . . Policies should be construed according to the sense and meaning of the terms used and if the language is clear and unambiguous it must be taken in its plain, ordinary and popular sense. (Cases Cited)

". . . . The rule that ambiguous language is to be construed most strongly against the insurer does not authorize a perversion of language or the exercise of inventive powers for the purpose of creating an ambiguity where none exist. (Case Cited)"

We have reviewed the policy in this case and find that it contains no inconsistencies or ambiguities. The policy itself is legible, simply worded and is contained

167

on one sheet of 8½″ by 11″ paper. The policy in its simplest terms agrees, in consideration of a definite premium, to pay certain benefits for certain losses sustained on an aircraft operated by a scheduled air carrier. Provided further, that at the time the insured sustains such injury or loss he is traveling on a transportation ticket covering the whole of said air line trip issued to him for transportation on an aircraft operated by a scheduled air carrier. The definition of an "aircraft operated by a scheduled air carrier" is set out in paragraph six of the policy quoted above. This definition contains no inconsistencies and is not ambiguous.

 The construction of the provisions of the policy is for the court and what is meant by the term "scheduled air carrier" is a question of law, but whether the airplane was in fact a "scheduled air carrier" within the meaning of the policy is a question of fact. Home Ins. Co. of New York v. Mendenhall, 164 Ill. 458, 45 N. E. 1078; Yates v. Bankers Life and Casualty Co., 415 Ill. 16, 111 N.E.2d 516; Goldstein v. Metropolitan Life Ins. Co., 324 Ill. App. 168, 57 N.E.2d 645.

In the case of Lachs v. Fidelity and Casualty Co. of New York, 306 N. Y. 357, 118 N.E.2d 555, a situation involving a scheduled air carrier was before the court.

In the Lachs case, supra, the defendant filed a motion for a summary judgment supporting its motion with affidavits. The plaintiff filed counter-affidavits, the motion for summary judgment was denied by the trial court, which order was affirmed by the Appellate Division and appealed by permission to the Circuit Court of Appeals. The clause for interpretation in the Lachs case was "civilian scheduled air lines" as contrasted with the term in the instant case "scheduled air carrier". The majority opinion in the Lachs case held that under the New York summary judgment procedure and the sharp conflict of facts there presented,

a question of fact for determination by a jury existed. The court at page 559 of 118 N.E.2d said:

"Plaintiff claims that Miami Airline, Inc., maintained regular, published schedules of fares and schedules showing passenger mile rates and that it held itself out as maintaining regular schedules of flights and tickets were sold for stated hours of departure and that it was licensed by the Civil Aeronautics Board to carry passengers and freight with large aircraft in interstate, overseas and foreign air transportation. We think there is a question of fact presented."

There is no such contention by the plaintiff in the instant case and there are no conflict of facts in the instant case such as existed in the Lachs case.

█ Plaintiff's complaint does not allege, nor does plaintiff contend that Robert J. Caruth was a passenger at the time of his death on an aircraft operated by a "scheduled air carrier", but alleges that he was on a plane "scheduled" to leave at 8:00 o'clock P. M. Plaintiff's theory is that since the plane was to leave at a prearranged time, it was scheduled within the meaning of the policy. Plaintiff contends that the term schedule in the policy has reference to the time and gives examples, such as: "a talk is scheduled", "we were scheduled to leave", "the attack was scheduled", "the parade is scheduled." We cannot agree with plaintiff's theory or argument. A prearranged time can be set for any type of airplane to take off, such as a private plane, a navy plane, an army plane or even today an aircraft to outer space or the moon. However, such prearranged time for take off does not make it a "scheduled air carrier" within the meaning of the policy before us.

The definition of "an aircraft operated by a scheduled air carrier" is set out in paragraph 6 of the policy, supra. Three different types of aircraft are defined as

169

being a scheduled air carrier. Definition number (1) states:

"Aircraft of United States registry, operated on a regular, special or chartered flight by a scheduled air carrier holding a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board of the United States of America, or its successor, and which in accordance therewith files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities at regular and specified times."

Definition numbers (2) and (3) are not here in question.

There is nothing ambiguous about the term scheduled air carrier. This term has a clear and concise meaning and when defined by any standard it simply denotes an air carrier which operates and holds itself out to the public that it does operate aircraft between designated points regularly, or with a reasonable degree of regularity, pursuant to a schedule previously announced. We are not unmindful of the fact that words have different meanings and different significations to different people on different occasions or under various and different circumstances, but we cannot perceive how the term scheduled air carrier can have other than one meaning; that being an air carrier which operates aircraft between designated points regularly in accordance with previously announced schedules.

The minority opinion in the Lachs case lent itself to a full, comprehensive and well written opinion concerning the interpretation of scheduled and non-scheduled air lines. At page 560 of 118 N.E.2d it was aptly stated in the minority opinion:

"In Alice's Wonderland, a word, said Humpty Dumpty, 'means just what I choose it to mean.' But, in a jurisdiction more mundane, I do not perceive how we

170

may say that the word 'scheduled' can mean 'non-scheduled,' nor do I see how we may tell a jury that it can say that an insurance policy which in express terms applies 'only' to 'scheduled airlines' can cover flights by an airline listed and self-described as 'non-scheduled'."

There is no evidence in the record that Peninsular Air Transport Company was a scheduled air carrier holding a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board of the United States, and which in accordance therewith files, prints, maintains and publishes schedules and tariffs for regular passenger service between named cities at regular and specified times. In fact, the evidence is without conflict that Peninsular was a non-scheduled air carrier. William Roy Robinson, a witness for the defendant, testified that he and his brother were partners and the partnership operated the Peninsular Air Transport Company with four aircraft operating under a Letter of Registration from the Civil Aeronautics Board and an Operating Permit from the Civil Aeronautics Administration, under Part 42 of the Civil Air Regulations. The Letter of Registration and Operating Certificate were for the specified type of air transportation commonly referred to as a "non-scheduled carrier." Under this Certificate, Peninsular Air Transport did not maintain scheduled flights nor did it file any schedules or tariffs for any regular passenger service with the Civil Aeronautics Authority, nor did it in November of 1955 advertise or hold itself out as maintaining any regular schedule of flights. This witness further testified that when the aircraft arrived at Boeing Field there were no flights for it. He had no particular flights in mind for it and it remained in Seattle three or four days. Mr. Robinson further testified that as an irregular air carrier operator, he sometimes only got a few hours' notice that he was going

171

to have a flight. Sometimes the bids are awarded the day prior to flight. He further stated, that if after arriving at Boeing on November 14th an agency would be able to make up a flight from there to Laredo, Texas, he would have flown that route. Peninsular Air Transport sold no tickets itself, all being sold through agencies. When these tickets are sold they sometimes stated the hour of departure and sometimes did not.

At the conclusion of all the evidence both plaintiff and defendant presented motions for a directed verdict. The court directed a verdict in favor of the plaintiff and denied defendant's motion. Where a motion to direct a verdict is made at the close of all the evidence, all of the evidence on both sides is to be considered, Dixon v. Smith-Wallace Shoe Co., 283 Ill. 234, 119 N. E. 265, the question being whether all of the evidence for both parties makes out a case, Funkhouser v. Illinois Bankers Life Ass'n, 237 Ill. App. 95.

It is not only the power but also the duty of the court to direct a verdict for plaintiff at the close of all the evidence when he has made out a case and no evidence tending to contradict it is offered, Marshall v. John Grosse Clothing Co., 184 Ill. 421, 56 N. E. 807, or no evidence has been produced by defendant that in any way constitutes a defense, Independent Oil Men's Association v. Fort Dearborn Nat. Bank, 311 Ill. 278, 142 N. E. 458. In the case before us the plaintiff has failed absolutely to make out a case and there is a complete absence in the record of any evidence fairly tending to prove all of the necessary elements of the plaintiff's case. Therefore, the court erred in granting plaintiff's motion for a directed verdict at the close of all the evidence.

The question of law presented to the court upon defendant's motion for a directed verdict at the close of all the evidence is whether, when all of the evidence

is considered, together with all reasonable inferences from it in its most favorable aspect to the plaintiff, there is a total failure to prove a necessary element of the plaintiff's case, Nelson v. Stutz Chicago Factory Branch, Inc., 341 Ill. 387, 173 N. E. 394. We conclude that there was no evidence in this case tending to prove the necessary element of the plaintiff's case that Caruth at the time of his death was a passenger on an aircraft operated by a scheduled air carrier as defined in the policy.

Where evidence of an affirmative defense is offered, as in this case, it is proper to direct a verdict for the defendant at the close of all the evidence, Wallner v. Chicago Consol. Traction Co., 245 Ill. 148, 91 N. E. 1053.

The record before us is void of any evidence placing the insured under the terms of the policy. On the contrary, the affirmative defense interposed by the defendant that the insured was not a passenger on an aircraft operated by a scheduled air carrier at the time of his death was established by uncontradicted evidence. That being the case, the lower court should have directed a verdict for the defendant.

The judgment of the Circuit Court of Winnebago county is reversed.

Judgment reversed.

CROW, P. J. and SOLFISBURG, J., concurs.