RONALD L. SCHROER, PERSONAL REPRESENTATIVE OF THE ESTATE OF HELEN M. SCHROER, DECEASED, APPELLANT, V. JOHN SYNOWIECKI ET AL., APPELLEES.

435 N.W.2d 875

Filed February 17, 1989.   No. 87-147.

John K. Green, of Nelson & Harding, for appellant.

Dean F. Suing and David A. Castello, of Katskee & Henatsch, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

The plaintiff, the personal representative of the estate of Helen M. Schroer, deceased, brought suit against the defendants for the wrongful death of the decedent. The defendants Frank J. and Rosemary H. Synowiecki are the owners of Dinker's Bar in Omaha, and the defendant John Synowiecki is a bartender at that bar. This is an appeal from an order sustaining the defendants' motion for summary judgment.

Summary judgment is an extreme remedy and should be awarded only when an issue is clear beyond all doubt. *Schatz v. Vidlak*, 229 Neb. 4, 424 N.W.2d 613 (1988).

Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from material facts and that the moving party is entitled to judgment as a matter of law. *Bedrosky v. Hiner*, 230 Neb. 200, 430 N.W.2d 535 (1988).

On an appellate review of a summary judgment, this court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.*

This action arose out of an automobile accident which occurred in Omaha during the early morning hours of December 29, 1984, when a truck driven at a high rate of speed by David C. Roth struck the rear of an automobile in which decedent was a passenger, causing the car to swerve. The driver of the automobile accelerated and attempted to negotiate a curve at a high rate of speed, and the automobile went up over the curb, plunged down an embankment, and crashed into a tree, causing the death of the decedent. Although not relevant to the action here, Roth was convicted of manslaughter, and the opinion of this court affirming that conviction may be found in *State v. Roth*, 222 Neb. 119, 382 N.W.2d 348 (1986).

On the night of December 28, the decedent and her brother, John Swendroski, went to Dinker's Bar. Several other family members joined them there later in the evening. They occupied a table at the front of the bar. Swendroski, according to his testimony and that of the bartender, John Synowiecki, consumed about five beers during the 3 hours they were in the bar.

Also at Dinker's that evening were Roth and his friends John Andrysik and Rodney Kroupa. They occupied a table near the rear of the bar and close to the pool table. The bartender estimated that Roth may have had seven or eight beers during the $2^{1}/_{2}$ to 3 hours that he was in the bar. According to the deposition testimony of Roth, Andrysik had more to drink during the evening than Roth and was really drunk.

During the night at the bar, there were several interactions between the members of the two groups. At about 12:30 a.m.,

Swendroski and a friend, Richard Corum, played pool against Andrysik and Kroupa. During the game, Andrysik was loud and vulgar, and, although Andrysik never grabbed Swendroski or threw anything at him, Swendroski said he felt intimidated and worried about Andrysik. However, Swendroski never made his feelings known to the bartender.

At the beginning of the game, the bartender, clearing a nearby table, heard Andrysik using vulgar language while complaining about the rack. Roth went over to Andrysik to settle him down, telling him to sit down and shut up. The bartender also went over to tell Andrysik to "settle down" and "cool down."

While the pool game was still going on, Emily Swendroski, the decedent's mother, got up to play some polka music on the jukebox. Using vulgar language, Andrysik complained about the music. John Synowiecki, the bartender, heard Andrysik's complaints, but said nothing to Andrysik because he thought he was the only one who heard the remarks and did not think the remarks were directed at a specific person.

Shortly after the pool game ended, the decedent went to the restroom. In order to get there, she had to pass by the table occupied by Roth and his friends. When she returned to her table, she told her mother that Andrysik had said something nasty to her and that she was scared. The decedent never disclosed what Andrysik had said that frightened her, nor did either she or her mother report this incident to the bartender.

At about closing time, Roth, Andrysik, and Kroupa got up to leave. Roth stopped to talk to the decedent's mother. He put his arm around her shoulder, asked her how old she was, complimented her on how well she looked for a woman her age, kissed her hand, and then left the bar. The bartender observed the exchange between Roth and Emily Swendroski and thought it was a friendly interaction. He did say that he was relieved that Roth and his friends were gone and that nothing had happened.

A few minutes later the decedent and her family also left the bar. The bartender went to unlock the back door to allow Emily Swendroski to leave that way because her car was parked closer to the rear of the bar. Emily talked with Synowiecki by the back door for a few minutes before leaving.

Meanwhile, the decedent and the others exited the front door and then stood outside in front of the bar discussing what they were going to do. John Swendroski said that he was not afraid to walk outside the bar, did not think somebody might be waiting for him outside, and did not feel there might be problems outside.

While the decedent and her group stood in front of Dinker's Bar discussing what they were going to do, Roth and his friends were also nearby, standing around Roth's truck, discussing what they would do next.

After decedent's family decided what to do, Corum walked past Roth and his friends on the way to his car and was struck on the side of the head by Kroupa. Roth and Andrysik claimed that Corum broke a beer bottle and was threatening them with it. Decedent and her family, watching Corum walk past Roth and his friends, saw Corum get hit. The decedent yelled, "Leave him alone." Andrysik began advancing on the decedent and her family and made an obscene comment. Meanwhile, Kroupa got a beer keg tapper out of Roth's truck and advanced on Corum again. When Andrysik turned to rejoin his friends, Swendroski was able to get his family, including the decedent, into his car. He then drove past the bar looking for Corum and apparently sideswiped Andrysik. Roth and Andrysik then jumped into Roth's truck and took off after the Swendroski car. Roth and Andrysik claimed that they did not know it was Swendroski who sideswiped Andrysik and that they began pursuit of the car in order to get the license plate number.

Synowiecki, the bartender, told by a customer that something was happening outside in front of the bar, observed the confrontations between the two groups from the time Andrysik was advancing on the decedent and her family while Roth and Kroupa were advancing on Corum. The bartender made no attempt to break things up, although he allegedly told a news reporter later on that he heard one of the members of the Roth group say, "They're dead now" after Swendroski sideswiped Andrysik and then drove off. After everyone had driven off, the bartender went back inside the bar and discussed with the customer whether he should call the police. Deciding not to call the police, Synowiecki continued to clean up.

During the ensuing less than 2-mile chase through residential areas, Swendroski and Roth, traveling at speeds between 25 to 70 m.p.h., ran through several stop signs and red lights. The rear end collision previously mentioned and the subsequent accident then occurred, which caused the death of the decedent.

Plaintiff assigns as error, generally, that the trial court erred in sustaining the motion for summary judgment in that tavern owners have a duty to protect their patrons from harm by third persons and to provide a safe departure from the premises. The facts are such, he argues, that it cannot be said as a matter of law that defendants did not breach those duties. In support of this contention, plaintiff advances five separate arguments:

1. A tavern keeper's duty to protect a patron continues even if injury occurs off-premises, if it arises out of events that occurred on-premises.

2. A tavern keeper owes a duty to patrons to provide safe ingress and egress.

3. A tavern keeper's duty to protect a patron continues off-premises if the tavern keeper breached the duty to protect while the patron was on-premises.

4. A tavern keeper has a duty to adequately police his or her premises and to employ sufficient personnel to maintain order and protect patrons.

5. Defendants violated Neb. Rev. Stat. § 53-180 (Reissue 1988) by serving alcohol to Roth and his friends who were already intoxicated, and this was evidence of defendants' negligence.

This court, in *Hughes v. Coniglio*, 147 Neb. 829, 25 N.W.2d 405 (1946), articulated the duty a proprietor of an establishment held open to the public owes to his patrons:

> The modern general rule, summarized in its simplest terms, is that the proprietor of a place of business who holds it out to the public for entry for his business purposes, is subject to liability to members of the public *while upon the premises for such a purpose* for bodily harm caused to them by the accidental, negligent, or intentionally harmful acts of third persons, if the proprietor by the exercise of reasonable care could have discovered that such acts were being done or were about to

be done, and could have protected the members of the public by controlling the conduct of the third persons or by giving a warning adequate to enable them to avoid harm. Restatement of the Law, Torts, § 348, p. 953.

(Emphasis supplied.) *Hughes, supra* at 833, 25 N.W.2d at 408. (Proposition now found at Restatement (Second) of Torts § 344 (1965).)

In *Hughes, supra*, the plaintiff was injured when a fight broke out between two customers as he entered defendant's restaurant. In affirming the trial court's sustaining of the defendant's motion to dismiss, this court held that the injury resulted from an altercation which occurred so suddenly and without warning that injury to the plaintiff could not be prevented.

*Hughes, supra*, and the following cases make it clear that the key to the proprietor's duty is the foreseeability of injury to the patron from a third person: *Welsh v. Zuck*, 192 Neb. 1, 218 N.W.2d 236 (1974) (patron pulled gun from pocket and pointed it into air when another patron grabbed him and, in the struggle, the gun discharged, injuring plaintiff, and court found that the patron with a gun was an intervening actor and the owner could not have foreseen that event); *Harvey v. Van Aelstyn*, 211 Neb. 607, 319 N.W.2d 725 (1982) (plaintiff was in defendant's bar dancing with his ex-wife when the latter's boyfriend entered the bar and immediately went over to the plaintiff and assaulted him; this court held that the defendant owner had no reasonable opportunity to prevent the harm). In *Harvey*, the court went on to state:

Under the general rule we have earlier cited [from *Hughes*], it is clear that the possessor of the premises is not bound to anticipate the unforeseeable independent acts of third persons, and it is only when such acts can reasonably be anticipated that the possessor has the duty to take some precautionary measures to protect against such independent acts.

*Harvey, supra* at 617, 319 N.W.2d at 730. See, also, *Vice v. Darm Corp.*, 224 Neb. 1, 395 N.W.2d 524 (1986); *Fimple v. Archer Ballroom Co.*, 150 Neb. 681, 35 N.W.2d 680 (1949).

All of these cases involved on-premises incidents, while the

injury in this case occurred off-premises. Plaintiff argues that the *locus* of injury does not control defendants' liability. Rather, he argues, it is whether the off-premises injury arose out of events that occurred while Schroer was on-premises that controls the liability of the owners.

Plaintiff cites us to *Raybourn v. Gicinto*, 307 S.W.2d 29 (Mo. App. 1957). In that case, the plaintiff was a customer in defendant's bar and was subjected to an unprovoked assault by two other bar patrons. The defendant "threw them [the two assaulters] out" the front door and told them that if they did not quit coming and making trouble, he would keep them out permanently. Plaintiff then started out the front door and said that he saw the two men waiting for him, so he asked the defendant to call the police. The defendant refused. The plaintiff threw a dime on the bar and asked another patron to call the police. The defendant said he did not want the police, so plaintiff started for the telephone to make the call himself, whereupon the defendant seized the plaintiff and threw plaintiff out the door into the arms of the two men, who then continued their assault on the plaintiff.

In affirming a verdict for the plaintiff, the court said:

> The jury could have believed that defendant might reasonably have anticipated that, if plaintiff walked out of the door, he would promptly be assaulted. The jury could have also believed that he must have known, by that time, that Chaney and his companion posed a danger to plaintiff because defendant had just ejected them because of their assault on him, and because plaintiff was asking that the police be called for his protection. The jury could further have found that, with full knowledge of the imminent danger to plaintiff he, nevertheless, forcibly thrust plaintiff into the waiting hostile arms of the two ejected patrons and that he was struck even as he was being ejected.

*Id.* at 31-32.

However, we do not agree with plaintiff's characterization of the facts of the case at bar as involving a situation where Roth and his friends "lay in wait" off-premises for decedent and her family because of the on-premises confrontations over the pool

game and the polka music.

In any event, there is no evidence that hard feelings over the pool game continued after the game ended. Although John Swendroski claims he felt intimidated and worried about Andrysik, there is no evidence in the record that the bartender was aware of those feelings. Furthermore, approximately 15 minutes elapsed between the end of the pool game and the departure of Roth and his friends.

Plaintiff characterizes the polka music incident as "an argument." There appears to have been no direct confrontation between anyone about the playing of polka music. The bartender heard Andrysik's complaints about the music, but did not feel that the complaints were directed at any one person. Emily Swendroski herself stated in her deposition that although she heard some kind of remark made by Andrysik, she thought it was about the pool game and not the music.

Although we must accept as true the fact that Andrysik said something that scared the decedent, we do not know what was said, but we do know from the record that the bartender was unaware of the decedent's fear of Andrysik.

Finally, Roth's exchange with Emily Swendroski as he was leaving appeared to be friendly. The bartender observed the incident and could reasonably have concluded that Roth's action was meant to indicate that there were no hard feelings toward anyone.

Although shortly after Roth and his friends left the bar, Synowiecki did announce that it was closing time and encouraged the stragglers to move on, he was as unaware as Swendroski that Roth and his group were still outside. Certainly, he did not "throw" decedent and her family out into the arms of the "villains" who were "lying in wait" for them, as was the case in *Raybourn v. Gicinto*, 307 S.W.2d 29 (Mo. App. 1957). As a matter of fact, decedent and her family stood in front of Dinker's Bar conversing among themselves for a minute or so before any trouble began between the groups.

If decedent's brother, Swendroski, who had more information available to him to cause any concern than was available to the bartender, could not foresee a problem, it is difficult to conclude that the bartender should have foreseen

what occurred. As noted by the court in *Pierce v. Lopez*, 16 Ariz. App. 54, 59, 490 P.2d 1182, 1187 (1971):

> [I]t is common knowledge that consumption of intoxicating liquors may excite emotions leading to violent disturbances the development of which a tavern keeper should be reasonably alert to detect and suppress. . . . We do not, however, find this to mean that a tavern keeper must possess extraordinary powers of foreseeability greater than a reasonable person in similar circumstances.

Apparently, the only Nebraska case dealing with an off-premises injury is that of *Crane v. Whitcomb*, 160 Neb. 527, 70 N.W.2d 496 (1955). In that case, the defendant tavern owner's husband was involved in a disturbance in the bar, and the plaintiff, a good friend of the defendant, intervened and tried to calm down the husband. In the process, the husband threatened to get a gun, and the plaintiff left the tavern. The husband went out into the street, saw the plaintiff in his truck, and called him over. The plaintiff parked his truck and, as he was getting out, saw the husband pull a gun out of his pocket. The plaintiff lunged for the gun; it went off; and the bullet hit the plaintiff.

Although, clearly, plaintiff's off-premises injury arose out of events that occurred on-premises, this court reversed the action of the trial court in overruling defendant's motions for a directed verdict and for judgment notwithstanding the jury verdict. In doing so, the court said:

> [D]efendant was not guilty of any negligence proximately causing plaintiff's injuries, and if she were, plaintiff had ample warning of danger which enabled him to be in a place of safety and to have avoided harm had he driven his truck away from the premises instead of parking it at the curb again. Further, under the evidence in this record, defendant owed plaintiff no duty where his injuries occurred off the premises in the street, when he voluntarily so returned for his own purposes and not for any business purpose in or with the tavern. In so doing, we conclude that he was guilty of negligence more than slight as a matter of law, which barred any recovery from defendant
> . . . .

178

*Id*. at 537, 70 N.W.2d at 502. See, also, *Radke v. Carpenter*, 281 Or. 671, 576 P.2d 365 (1978).

In *Radke, supra*, the plaintiff suffered injury off-premises. He had been ejected from the defendant's tavern for fighting with two other men. Outside, and some distance from the tavern, he got into another fight with the same men. The Oregon Supreme Court affirmed the directed verdict for the defendant, finding that the plaintiff voluntarily confronted the two men. According to the Oregon court, the plaintiff's injury was caused by his decision to accost the men over another incident, conduct the defendant could not reasonably foresee.

Whether the bartender saw the activities outside in time to call the police or otherwise render aid, the fact remains that Swendroski had ample warning of whatever the danger was from Roth and his friends. Once he and his family were in his automobile, he was in a place of safety and could have avoided harm had he driven away from the bar. Laudable as his motives might have been in driving past the bar in an attempt to see if his friend was all right, the fact remains that he voluntarily returned for his own purposes and not for any business purpose in or with Dinker's Bar. Even if it could be said that defendants, including the bartender, breached a duty owed to the decedent, their negligence would not be the proximate cause of the chase between Roth and Swendroski and of the resulting accident.

> Proximate cause, as used in the law of negligence, is that cause which in a natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred. It is not sufficient that the negligence charged furnishes only a condition by which the injury is made possible, for if such condition causes an injury by the subsequent independent act of a third person, the two acts are not concurrent and the existence of the condition is not the proximate cause of the injury.

*Weichel v. Lojka*, 185 Neb. 819, 824, 179 N.W.2d 112, 115-16, (1970).

Swendroski, by his independent actions in driving past the bar and sideswiping Andrysik, became an intervening force, and, therefore, the bartender could not have foreseen the events

that occurred and could not possibly have prevented what happened.

> "An efficient intervening cause is a new and independent force which breaks the causal connection between the original wrong and the injury. *Coyle v. Stopak, supra.* In *Coyle, supra* at 606-07, 86 N.W.2d at 768, we further said: ' "The causal connection is broken if between the defendant's negligent act and the plaintiff's injury 'there has intervened the negligence of a third person who had full control of the situation and whose negligence was such as the defendant was not bound to anticipate and could not be said to have contemplated, which later negligence resulted directly in the injury to the plaintiff.' " ' "

*London v. Stewart*, 221 Neb. 265, 267, 376 N.W.2d 553, 555 (1985), quoting *Shelton v. Board of Regents*, 211 Neb. 820, 320 N.W.2d 748 (1982). See, also, *Stodola v. Grunwald Mechanical Contractors*, 228 Neb. 301, 422 N.W.2d 341 (1988).

There remains to be discussed plaintiff's argument as to the applicability of § 53-180. We believe this was adequately discussed and disposed of contrary to the position of the plaintiff in *Holmes v. Circo*, 196 Neb. 496, 504, 244 N.W.2d 65, 70 (1976), wherein this court said:

> [W]e conclude that section 53-180, R.R.S. 1943, does not create a duty toward third parties, and, as such, the statute does not fix a standard of care, the violation of which could be proof of negligence in actions by third parties. To rule otherwise would thwart the intention of the Legislature.

The judgment of the district court is affirmed.

AFFIRMED.

GRANT, J., concurring in the result.

I believe that fact questions were presented as to whether defendants were negligent in the operation of their bar business and as to whether those acts of commission or omission resulted in plaintiff's damages, whether those damages occurred inside or just outside the bar itself. I agree, however, that the actions of the decedent's party in returning to the bar area and endangering Andrysik constituted an intervening cause, which could not reasonably be foreseen by defendants, and that,

therefore, defendants' actions or failure to act was not the proximate cause of the damages. I would affirm on that ground.