DOUGLAS CARNES, APPELLEE AND CROSS-APPELLANT, V. JERRY L. SCHRAM ET AL., APPELLEES, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, A CORPORATION, GARNISHEE-APPELLANT AND CROSS-APPELLEE.

440 N.W.2d 451

Filed May 26, 1989.   No. 87-795.

Joseph K. Meusey and Michael F. Coyle, of Fraser, Stryker, Veach, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for garnishee-appellant.

Michael M. O'Brien, of Matthews & Cannon, P.C., for appellee Carnes.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Douglas Carnes, the plaintiff in this action, filed an application for determination of garnishee liability against State Farm Mutual Automobile Insurance Company in the

district court for Douglas County. The court sustained Carnes' motion for summary judgment. We reverse and remand with directions.

Summary judgment is an extreme remedy and should be awarded only when an issue is clear beyond all doubt. *Schroer v. Synowiecki*, 231 Neb. 168, 435 N.W.2d 875 (1989).

A summary judgment is properly granted when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue concerning any material fact or the ultimate inferences deducible from such fact or facts and that the moving party is entitled to judgment as a matter of law. *Hall v. Phillips*, 231 Neb. 269, 436 N.W.2d 139 (1989).

In reviewing an order granting a summary judgment, this court must take the view of the evidence most favorable to the party against whom it operates and give that party the benefit of all favorable inferences which may be drawn from the evidence. *Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 436 N.W.2d 184 (1989).

The denial of a motion for summary judgment is not an appealable order. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989).

On May 18, 1982, James Schram and Richard Krajicek traveled in Schram's 1975 Ford truck from their farms in Gretna to Dunlap, Iowa, to buy feeder pigs. The truck could not hold all of the pigs the two purchased, so Schram and Krajicek each called Gretna and told his son to come to Dunlap to pick up the remaining pigs. Krajicek's son Mark drove the Krajiceks' 1969 truck, with Schram's son Jerry as passenger.

Shortly after leaving Gretna, the truck began to run poorly. Near Omaha, Jerry called his father, James Schram, who advised the boys to return home with the Krajicek truck. Schram had already returned to Gretna in his truck and had unloaded the first load of pigs, so Schram told Jerry to take that truck to Dunlap for the second load of pigs. Jerry did so, with Mark as his passenger. Near Crescent, Iowa, Jerry turned into the path of Douglas Carnes' motorcycle and sidecar, injuring Carnes and his wife and killing Carnes' daughter.

Carnes brought an action in Sarpy County against James

and Jerry L. Schram. Judgment was entered against the Schrams in the amount of $255,323.90 on July 17, 1984. Carnes received partial satisfaction of judgment from Farmers Mutual Insurance Company, James Schram's insurer.

Seeking satisfaction of the remainder of the judgment, Carnes filed an affidavit and praecipe for garnishment against State Farm, which had a policy on the truck owned by Richard Krajicek. Carnes' action was based on the claim that the Schram truck involved in the accident was a "temporary substitute automobile" under Richard Krajicek's State Farm policy, and therefore Jerry Schram was an additional insured under the omnibus clause of that policy. In its answer to the interrogatories in garnishment, State Farm denied that it was indebted in any manner to Jerry Schram.

Carnes then filed an application for determination of garnishee liability. Both State Farm and Carnes filed motions for summary judgment. The district court overruled State Farm's motion and sustained Carnes' motion, and entered judgment accordingly.

There are 10 assigned errors and, in addition, Carnes cross-appeals on the issue of the award of interest on the judgment, but it is only necessary for us to determine whether Schram's truck was a temporary substitute automobile under Krajicek's insurance policy in order to dispose of this controversy.

There are two sections of the State Farm policy critical to a determination of this case.

> **Temporary Substitute Car**—means a **car** not owned by **you** or **your spouse** if it replaces **your car** for a short time. Its use has to be with the consent of the owner. **Your car** has to be out of use due to its breakdown, repair, servicing, damage or **loss**. A **temporary substitute car** is not considered a **non-owned car**.
>
> . . . .
>
> **Who Is an Insured**
>
> When we refer to **your car**, a **newly acquired car** or a **temporary substitute car, insured** means:
>
> 1. **you**;
>
> . . . .

4. any other **person** while using such a **car** if its use is within the scope of consent of **you** or **your spouse** . . . .

(Emphasis in original.)

Jerry Schram would be covered as an insured under the State Farm policy *only* if he was using Krajicek's temporary substitute automobile with Krajicek's permission and, of course, *only* if the truck belonging to James Schram and being used by Jerry Schram can be said to be a temporary substitute automobile of Richard Krajicek's.

There is nothing in the record from which it can be inferred that James Schram ever loaned his truck to Richard Krajicek or that the latter ever asked for its use. The two fathers had hogs yet to be picked up at Dunlap, Iowa, after the initial trip. As is the custom in rural communities, farmers help each other out. Other than a matter of courtesy, Schram having furnished his truck for the first trip, there was no obligation on the part of Richard Krajicek to provide the transportation for the second trip. The hogs needed to be picked up, and Schram had a vehicle available to do so and Krajicek did not. Schram directed his son to drive the truck to Iowa, and young Krajicek simply rode along to help with the loading. Krajicek was not in a position to nor did he attempt to grant permission to Jerry Schram to drive James Schram's truck.

In *Tanner v. Pennsylvania Threshermen & F. M. C. Ins. Co.*, 226 F.2d 498 (6th Cir. 1955), the named insured, Mike Zarzour, operated a cafe in Chattanooga, as did his brother Louis in another place in the same city. Mike's automobile, covered by the insurance policy, was in a repair shop. Louis, with his own automobile, pushed Mike's car to the garage for Mike. After driving Mike back to his restaurant, Louis turned his (Louis') car over to Mike, who drove to a curb market to get some produce and to another location to get some change. Mike then returned the car to Louis, but asked Louis to get him (Mike) some beef for use in the latter's restaurant. Louis undertook to accomplish the errand in his car and also picked up his wife and children. During this trip, Louis became involved in an accident.

Following a lawsuit in which plaintiff obtained a judgment against both Mike and Louis, the plaintiff attempted to satisfy

that award against Mike's insurance policy, asserting that Louis' car was a "substitute car" under the provisions of that policy. The district court directed a verdict for the insurance company. In affirming that action, the court of appeals said: "He [the district judge] construed the word 'substitute car' to mean a car which was in the possession or under the control of the insured to the same extent and effect as the disabled car of the insured would have been except for its disablement." *Id.* at 500.

In *Fulton v. Woodford*, 17 Ariz. App. 490, 498 P.2d 564 (1972), Sanner Contracting Company had a subcontract to do some paving and to supply the necessary dirt fill. It contracted with Conway to furnish the necessary trucks. Conway did not have sufficient trucks for the job and therefore hired Fulton to supply additional trucks. Fulton had a general automobile liability insurance policy issued by Harleysville insurance company. Fulton did not have sufficient trucks in operating condition to meet Conway's needs, so he engaged Patterson to supply his truck for a part of the hauling undertaking.

On his first run, Patterson collided with a motorcycle operated by Johannsen, which collision resulted in Johannsen's death. His widow sought a judgment for damages against all parties. The question which ultimately arose was whether Patterson's truck was a temporary substitute automobile under Fulton's policy.

In holding that the truck qualified as a temporary substitute automobile, the Arizona court stated:

> The purpose of the substitution provision is to extend coverage temporarily and automatically, without the payment of an additional premium, to the insured to protect him when he uses a vehicle not specified in the policy in place of the specified vehicle he intended normally to use but did not because of its withdrawal from use for a reason stated in the policy.

*Id.* at 495, 498 P.2d at 569.

The court continued by stating:

> The only reason for the use of Patterson's truck on the day in question was the disablement of one of Fulton's trucks which would have been used, had it been available, to the

same extent as was Patterson's truck. Under these circumstances, Patterson's vehicle was a temporary substitute for Fulton's vehicle and therefore insured under the Harleysville policy.

*Id*. at 496, 498 P.2d at 570.

In distinguishing *Tanner v. Pennsylvania Threshermen & F. M. C. Ins. Co.*, 226 F.2d 498 (6th Cir. 1955), previously cited, the court said: "Actually the errand performed by the brother was no more than a brotherly accommodation *and was not for the purpose of fulfilling a prior undertaking of his brother.*" (Emphasis supplied.) 17 Ariz. App. at 496, 498 P.2d at 570.

*Lumbermen's Mutual Cas. Co. v. Harleysville Mut. Cas. Co.*, 367 F.2d 250 (4th Cir. 1966), involved an action to recover from William Dalton's policy of insurance with State Farm Mutual Automobile Insurance Company under that policy's "temporary substitute" provision. William Dalton owned a 1954 Ford automobile, which was insured under the policy. His son, Ray Dalton, who was unmarried at the time and living at the home of his father, owned a 1955 Ford and had no liability insurance in effect on that automobile.

William and Ray Dalton were both employed at the Burlington Mills and drove back and forth to work. Some months prior to the accident in question, William had agreed to transport certain other persons to and from work at the same plant. Those persons agreed to pay and did pay William a certain amount per day for that transportation.

On the day in question, as William and his son prepared to leave their home and pick up the passengers, William could not get his car started. He therefore suggested that his son Ray should take his car to pick up those passengers. An accident resulted, and after obtaining judgment against the two Daltons and two other tort-feasors, the plaintiff sought to recover from the various insurance carriers, including William's insurer, State Farm. In holding that recovery might be had from State Farm, the court of appeals concluded that Ray's automobile was a temporary substitute automobile under William's insurance.

In support of its holding, the court stated:

William Dalton according to the stipulation had an understanding with certain persons, including Gertrude

Southern, to transport them to work. Each of them agreed to pay him for this service. There was no such arrangement with Ray. Consequently, when William's car was disabled and he suggested that Ray "would *have to take his car* to work *and pick up these passengers*," William was employing Ray's car to perform William's undertaking. . . . For the emergency, William in effect borrowed, and Ray loaned, the latter's car. Who was to drive was immaterial to William. The reality of substitution is accented by the circumstance that the two cars were kept in the same location and owned by members of the same household and family. True, Ray may have had his own purposes for the trip aside from his father's, but this does not detract from the fact that William was also using the car to do what he would have done with his own.

*Id.* at 254.

Thus, the legal and contractual compulsion regarding the use of the vehicles in *Fulton v. Woodford*, 17 Ariz. App. 490, 498 P.2d 564 (1972), and *Lumbermen's Mutual* is· replaced in the instant case by a simple act of courteous reciprocity, and there can be no suggestion that James Schram ever intended to or did in fact loan his vehicle to Richard Krajicek, nor did the latter ever have such possession that would entitle him to authorize its use by another.

Having cited with approval *Tanner*, we adopt its rule that in order for a nonowned motor vehicle to be covered as a "temporary substitute car" under an insured's policy of insurance, the nonowned motor vehicle must be in the possession of or under the control of the insured to the same extent and effect as the disabled car of the insured would have been except for its disablement. If it is found that the alleged substitute automobile was being driven by its owner or his or her designee, and not by the named insured or his or her designee, then it was not in possession of or under the control of the named insured, and the vehicle was not a temporary substitute car within the meaning of the policy. See, also, *Babineaux v. Lavergne*, 321 So. 2d 401 (La. App. 1975); *Harte v. Peerless Ins. Co.*, 123 Vt. 120, 183 A.2d 223 (1962).

We therefore find as a matter of law that the truck owned by James Schram and being driven at his direction by his son Jerry Schram was not at that time a "temporary substitute car" of Richard Krajicek's under the latter's policy of automobile insurance issued by State Farm. Accordingly, the judgment of the district court is reversed and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.