DENNIS M. RATIGAN, APPELLANT, V. K.D.L., INC., DOING BUSINESS AS SUNDOWNER BAR, APPELLEE.

573 N.W. 2d 739

Filed January 2, 1998.    No. S- 96-415.

William J. Pfeffer and Jeff T. Courtney, of Pfeffer Law Offices, for appellant.

J. Joseph McQuillan and Scott A. Calkins, of Walentine, O'Toole, McQuillan & Gordon, for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

STEPHAN, J.

Shortly after midnight on September 15, 1993, Michael Ray Smith shot Dennis M. Ratigan, Sr., during an altercation in the parking lot of the Sundowner Bar. Both men had been in the

tavern prior to the incident. Ratigan brought this personal injury action against K.D.L., Inc., the owner of the Sundowner Bar, claiming that it was negligent in failing to take measures to prevent the shooting and to protect him from harm. The district court for Sarpy County granted summary judgment in favor of K.D.L., and Ratigan appealed. Pursuant to our authority to regulate the caseloads of the Nebraska Court of Appeals and this court, we removed this case to our docket on our own motion. We determine that there are genuine issues of material fact which preclude summary judgment and, therefore, reverse, and remand to the district court for further proceedings.

## BACKGROUND

In his petition, Ratigan alleged that he was "assaulted and battered" by Smith while on the premises of the Sundowner Bar in Sarpy County, Nebraska, on September 15, 1993. He alleged K.D.L. was negligent in (1) failing to warn him of the "dangerous propensities" of Smith and his companion, (2) failing to protect him from assault by Smith despite actual or constructive knowledge that the assault would occur, (3) failing to summon police in sufficient time to prevent the assault, (4) failing to employ adequate security personnel, (5) retaining incompetent employees, and (6) failing to establish or implement safety precautions. Ratigan alleged that as a direct and proximate result of this negligence, he received serious and permanent injuries. In its answer, K.D.L. admitted that the assault occurred on its premises, but denied that it was negligent and alleged that Ratigan's injury was "caused by the intentional unforeseen criminal conduct of Michael Ray Smith."

In support of its motion for summary judgment, K.D.L. offered the depositions of Ratigan; his wife, Micheline Ratigan; Brian C. Champion; Donald Finley; and Kenneth Pokorny. Ratigan did not object to any of the depositions and offered no additional evidence.

*Deposition Testimony of Ratigan.*

Ratigan and his wife arrived at the Sundowner Bar at approximately 11 p.m. on September 14, 1993. There were 10 to 15 other patrons in the tavern when they arrived, including their son, Dennis Ratigan, Jr. (Ratigan Jr.), and his friend, Danny Lee,

who were playing pool with Michael Ray Smith and his companion. Ratigan and his wife sat down at the bar, which was 20 to 25 feet away from the pool table. They were served beer by the bartender, Champion. Ratigan accepted his son's invitation to join him in a pool game against Smith and his companion.

When the game was over, Smith placed Ratigan Jr. in a headlock and rubbed his hair with his knuckles, stating that he would "teach the young punk about the game." Sensing that the contact between Smith and Ratigan Jr. was "getting out of hand," Ratigan offered to buy Smith and his companion a drink in order to diffuse the situation. At about the same time, Champion approached the pool table and told Smith and Ratigan Jr. to "knock it off." After paying Champion for the drinks, Ratigan sat down with his wife at the bar.

Ten to fifteen minutes later, Ratigan asked Champion where Ratigan Jr. was and Champion replied that he was uncertain, but he thought that Ratigan Jr. had left. Curious as to why his son would have left without saying goodby, Ratigan walked to a window at the front of the tavern and observed Smith and his companion "beating on" Ratigan Jr. in the parking lot of the tavern. After asking Champion to call the police, Ratigan went through the front door and ran toward the fight. He first threw Smith aside and then fought with Smith's companion. After 2 to 3 minutes, Ratigan heard someone shout, "He's got a gun." Ratigan stood up and began walking back toward the front door of the tavern. He observed Smith standing near a pickup truck with a gun in his hand, and he heard Smith say, "I'm going to kill you, Old Man." He then felt a bullet strike him in the stomach. Ratigan then walked back into the tavern and asked Champion to call an ambulance.

After the incident, Ratigan learned from various sources that Smith had at one time been "barred" from the Sundowner Bar because he was a "troublemaker."

*Deposition Testimony of Micheline Ratigan.*

Micheline Ratigan is married to Ratigan and is the mother of Ratigan Jr. Lee and Ratigan Jr. were already present at the Sundowner Bar when she and Ratigan arrived on the evening of September 14, 1993.

While seated at the bar, Micheline Ratigan watched her husband and son play pool with Smith and his companion. During the game, Smith was loud and obnoxious and appeared to Micheline Ratigan to be "intoxicated or on drugs. Just very weird." When the game was over, she observed Smith place her son "in a headlock" and tease him, calling him a "young punk." She thought that Smith's actions were hurting her son physically. She observed Ratigan intercede and buy a drink for Smith and his companion in order to calm things down; Ratigan then returned to the bar and sat down next to her.

Sometime later, Ratigan and Micheline Ratigan realized that their son was no longer in the tavern. Ratigan got up from the bar and walked out the front door of the tavern to look for him. Approximately 2 minutes later, Micheline Ratigan walked to the front door and looked outside. She observed her son fighting with Smith's companion. She did not immediately see her husband, but called his name and then observed him running to the aid of their son. The next thing she recalled was hearing a gunshot and observing her husband come into the tavern, stating that he had been shot. She testified that "minutes" transpired from the time she first observed the fight through the window until her husband returned to the tavern and that Champion was standing behind the bar during this period.

*Deposition Testimony of Champion.*

Champion estimated that Ratigan Jr. arrived at the Sundowner Bar at approximately midnight or 12:30 a.m. and that his parents were already there when Ratigan Jr. arrived. With regard to Smith, Champion testified as follows:

Q. . . . Do you recall Mike Smith coming in that night?
A. Yes.

Q. Do you know approximately what time he came in?

A. He was in there probably twelve-thirtyish. It was close to being last call, so I wasn't really going to mess with him because he's not — he wasn't supposed to be in there in the first place.

Q. Why is that?

A. Back when — when was it we opened the bar, September? Let's say in mid September is when we took over the bar, and he had been in there a couple of months

after we opened, so it'd probably be November or December, and he got in a fight or whatnot, and the bar owner, Keith, was there that night and had kicked him out. We didn't find out until a couple months later who [sic] his name was and what he was. I mean, we didn't know who he was then.

Q. That was probably almost a year before the shooting incident?

A. Yes. So I never really knew who he was. It was just that a girl that goes in there all the time, his wife or ex-wife — she says ex-wife, but they're still married, as far as I know. She said, "Well, yeah, that guy that got kicked out of here last month or whatever is my ex-husband, and he's trouble" and this and that. So he's out of here now. We don't have to worry about him anymore.

Q. You hadn't seen him in the bar until the night the shooting occurred?

A. I'd seen him in there. See, he's the kind of guy that don't take — you know, I'm not going to cause trouble. When he comes in, he comes in and — he'd only been in probably two or three times where I'd just glance over there and see him over there. He wouldn't even order a beer. Half the time he'd come in and just talk to a buddy and then leave. I don't know. He'd never really do nothing.

Q. He wasn't one of the regular customers?

A. Oh, no.

Champion observed the pool game involving Ratigan, Ratigan Jr., Smith, and Lee. After the game, he noticed Smith "just antagonizing and messing with Denny, Jr." Champion described what transpired next:

It was something I was just waiting for — I was like — it finally got to the point where I'm like — I can see Denny is getting sick of it, and I had enough of it, and I didn't want anything happening in the bar, and that's about when I stepped in and said, "All right. It's 1:00. Everybody get out."

He testified that Ratigan Jr. and Lee left the tavern, while Smith and his companion finished their beers and left 2 to 3 minutes later. Champion testified that at that point that "I was happy they were all gone. You know, nothing happened in the bar.

That's my main concern. Nothing happens in the bar. If it happens outside, it isn't as much a concern as what happens inside. So once they're outside, I was fine, you know."

Champion testified that he remained inside the tavern picking up drinks and announcing "last call" to the remaining patrons. Then, four persons entered the tavern and said there was a fight in the parking lot. Champion then walked to the door and observed Ratigan Jr., Lee, Smith, and Smith's companion fighting in the parking lot, and Ratigan attempting to break up the fight. He locked the door and told the tavern patrons to remain inside. He then resumed picking up drinks, but then became "worried" about the fight in the parking lot and returned to the front door and looked outside. Champion described what he then saw:

I don't know where Danny Lee was. Denny, Jr., I didn't see him, but I seen Smitty getting in his truck. Now, I knew exactly what he was doing because he wasn't getting in to sit down. He was reaching, and I just kind of yelled at him. I said, "Hey, I called the cops." But I hadn't yet.

Champion acknowledged that he "should have probably" called the police prior to this point, but had not done so because the fight "didn't seem too major, you know, and it was breaking up." He then observed Smith waving a gun and heard him say "All right. Now who's tough now." He also observed Ratigan standing nearby. He again told Smith that he had called the police, although he had not. Champion then closed and locked the front door again and called the police from inside the tavern. He returned to the front door and observed Ratigan Jr. and Smith on the ground fighting, with Smith still in possession of the gun. He then observed Ratigan approach the other two men and stop approximately 2 feet away from where Champion was standing. Smith then stood up and shot Ratigan at a range of 4 to 5 feet. Champion went out to the parking lot and brought Ratigan back into the tavern.

*Deposition Testimony of Finley.*

Finley, Pokorny, and another man arrived at the Sundowner Bar at approximately 8:30 p.m. on September 14, 1993. Ratigan Jr. and Lee were already present when they arrived; Ratigan and his wife came in a short time later. At approximately 11 p.m.,

Finley observed Ratigan Jr. and Smith arguing about a pool game. He observed Ratigan Jr. and Lee walk outside the tavern immediately after the argument. Between 10 and 30 minutes later, he saw Smith's companion walk out the door, followed approximately a minute later by Smith.

Finley and Pokorny left the tavern 5 to 10 minutes later, just as Ratigan was leaving. Finley observed Ratigan Jr., Lee, Smith, and Smith's companion fighting in the parking lot. Ratigan entered the fight to assist his son, resulting in a "free-for-all" involving the five men which lasted for several minutes until it was broken up by Finley, Pokorny, and others. Smith walked to his vehicle and returned about 2 minutes later with a gun in his hand. Smith waved the gun at those present and shouted threats. Approximately 4 minutes after Smith first appeared with the gun, Finley saw Smith point it toward where Ratigan was standing near the front door of the tavern and fire.

*Testimony of Pokorny.*

Pokorny arrived at the Sundowner Bar at approximately 11 p.m. on the night of the shooting, accompanied by Finley and another man. Pokorny observed Ratigan Jr. arguing with Smith, followed by Champion asking Ratigan Jr. to leave the premises. He then observed Ratigan Jr. and Lee leave the tavern "right before last call." Five to ten minutes later, he saw Smith and another man leave the tavern. A short time later, Pokorny looked out the window and "noticed there was a brawl outside" involving Ratigan Jr. and Smith. Pokorny immediately went outside, grabbed Ratigan Jr., and attempted to wrestle him into a vehicle. At that point, he observed Smith standing nearby with a gun, pointing it first at him and Ratigan Jr., and then waving it in the direction of other individuals nearby and shouting, "[W]hich one of you degenerates want to die first." Ratigan Jr. then attempted to take the gun away from Smith but was unsuccessful and fell to the ground. Ten to fifteen seconds later, Smith shot Ratigan.

## ASSIGNMENT OF ERROR

Ratigan alleges that because of the existence of genuine issues of material fact, the district court erred in entering summary judgment in favor of K.D.L.

## SCOPE OF REVIEW

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to summary judgment as a matter of law. *Farmers Union Co-op Ins. Co. v. Allied Prop. & Cas., ante* p. 177, 569 N.W.2d 436 (1997); *Schendt v. Dewey*, 252 Neb. 979, 568 N.W.2d 210 (1997).

When reviewing an order granting a motion for summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Tracy v. City of Deshler, ante* p. 170, 568 N.W.2d 903 (1997); *Schendt v. Dewey, supra*. The question on such review is not how a factual issue is to be decided, but whether any real issue of genuine fact exists. *Vilcinskas v. Johnson*, 252 Neb. 292, 562 N.W.2d 57 (1997); *Melick v. Schmidt*, 251 Neb. 372, 557 N.W.2d 645 (1997).

## ANALYSIS

A party moving for summary judgment must make a prima facie case by producing enough evidence to demonstrate that it is entitled to a judgment if the evidence were uncontroverted at trial. If such a showing is made, the opposing party has the burden to produce evidence showing an issue of material fact which prevents judgment as a matter of law for the moving party. However, if a prima facie showing is not made, the opposing party is not required to reveal evidence which he or she expects to produce at trial to prove the allegations contained in his or her petition. *Melick v. Schmidt, supra; Washa v. Miller*, 249 Neb. 941, 546 N.W.2d 813 (1996); *Zion Wheel Baptist Church v. Herzog*, 249 Neb. 352, 543 N.W.2d 445 (1996). K.D.L. offered five depositions in support of its motion for summary judgment and Ratigan offered no evidence in response. Therefore, we review the record to determine whether the evidence offered by K.D.L., when viewed in a light most favorable to Ratigan, is sufficient to entitle K.D.L. to judgment as a matter of law.

In order to succeed in a negligence case, a plaintiff must establish the defendant's duty not to injure the plaintiff, a breach of that duty, proximate causation, and damages. *Sacco v. Carothers, ante* p. 9, 567 N.W.2d 299 (1997); *Robinson v. Bleicher*, 251 Neb. 752, 559 N.W.2d 473 (1997). Ratigan alleges that as the owner of the Sundowner Bar, K.D.L. breached its duty to protect him from harm caused by a third party while on the premises. The nature and scope of that duty are not in dispute.

Our law is well settled that the owner of a business establishment which is open to the public does not ensure the safety of its patrons, but does owe them a duty of reasonable care. See *Hulett v. Ranch Bowl of Omaha*, 251 Neb. 189, 556 N.W.2d 23 (1996). We first articulated this duty in *Hughes v. Coniglio*, 147 Neb. 829, 25 N.W.2d 405 (1946), in which we adopted Restatement of Torts § 348 (1934), now Restatement (Second) of Torts § 344 (1965). We stated in *Hughes:*

> The modern general rule, summarized in its simplest terms, is that the proprietor of a place of business who holds it out to the public for entry for his business purposes, is subject to liability to members of the public while upon the premises for such a purpose for bodily harm caused to them by the accidental, negligent, or intentionally harmful acts of third persons, if the proprietor by the exercise of reasonable care could have discovered that such acts were being done or were about to be done, and could have protected the members of the public by controlling the conduct of the third persons or by giving a warning adequate to enable them to avoid harm.

147 Neb. at 833, 25 N.W.2d at 408.

Under this standard of care, the duty owed by the business owner is not absolute but " 'is graduated according to the danger attendant upon the activities of the business pursued and depends upon the facts and circumstances surrounding each particular case.' " *Hulett v. Ranch Bowl of Omaha*, 251 Neb. at 193-94, 556 N.W.2d at 27, quoting *Hughes, supra.* We have consistently applied this standard of care to claims that the owner or proprietor of a restaurant, tavern, or similar establishment is liable to a patron for injury caused by another patron

while on the premises. See, *Hulett v. Ranch Bowl of Omaha, supra*; *Schroer v. Synowiecki*, 231 Neb. 168, 435 N.W.2d 875 (1989); *Harvey v. Van Aelstyn*, 211 Neb. 607, 319 N.W.2d 725 (1982); *Welsh v. Zuck*, 192 Neb. 1, 218 N.W.2d 236 (1974); *Crane v. Whitcomb*, 160 Neb. 527, 70 N.W.2d 496 (1955); *Fimple v. Archer Ballroom Co.*, 150 Neb. 681, 35 N.W.2d 680 (1949). Whether a business proprietor is liable for the adverse actions of a third party against an invitee depends primarily upon whether those actions were reasonably foreseeable to the proprietor. *Hulett v. Ranch Bowl of Omaha, supra.*

We have recognized that a history of violent conduct, or the absence of such a history, is an important factor in determining whether a proprietor should have foreseen a particular violent act on its premises. For example, in *Hughes v. Coniglio, supra*, the patron of a restaurant was injured during a fight between two other patrons. We cited general authority holding that an innkeeper may be liable if " 'he admits to his place, or permits to remain there, as a guest, a person of known violent and disorderly propensities, who will probably assault or otherwise maltreat his guests . . . .' " 147 Neb. at 833, 25 N.W.2d at 408. However, we held as a matter of law that the restaurant owner was not negligent because there was no evidence of previous fights or disorderly conduct at the restaurant and no evidence that the owner had any notice that the patrons involved in the fight "had quarrelsome, violent, or disorderly propensities." *Id.* at 832, 25 N.W.2d at 408.

Similarly, in *Welsh v. Zuck, supra*, we held as a matter of law that a tavern owner was not liable for an accidental shooting injury which occurred when one patron pointed a gun at another, notwithstanding the fact that the owner knew that the gun was in the possession of the patron. We noted that the patron originally brought the weapon into the tavern to be " 'target[ed] in' " at a range located in the basement of the establishment and that the tavern owner believed the weapon to be unloaded at the time of the incident. *Id.* at 7, 218 N.W.2d at 240. We held that these facts afforded no basis for the tavern owner to anticipate an altercation involving the gun, particularly "in view of the undisputed evidence that [the gun owner] had never

been quarrelsome or in any way obnoxious or obstreperous at prior occasions as a regular patron of the bar." *Id.*

In this case, however, there is evidence that Champion knew that Smith had been ejected from the Sundowner Bar for fighting less than a year prior to Ratigan's injury. While it is not clear whether this was intended as a permanent ban from the premises, a jury could reasonably infer that it was and that Champion failed to enforce it. It is also reasonable to conclude that if Smith had been denied admission to the tavern, Ratigan's injury would not have occurred.

We recently examined the relationship between prior criminal conduct at a drinking establishment and the foreseeability of similar conduct in *Hulett v. Ranch Bowl of Omaha*, 251 Neb. 189, 556 N.W.2d 23 (1996). In that case, the plaintiff was assaulted with a beer mug by another guest during an after-hours party. We held that while the proprietor had no reason to expect an attack by that particular individual, the forseeability of harm was established by other evidence, including the routine occurrence of fights during similar events at the establishment. Quoting our prior holding in *Erichsen v. No-Frills Supermarkets*, 246 Neb. 238, 518 N.W.2d 116 (1994), that " 'many occasions of "similar" criminal activity in one fairly contiguous area in a limited timespan may make further such acts sufficiently foreseeable to create a duty to a business invitee,' " we concluded that "[w]hether a history of criminal activity makes an assault foreseeable is a question of fact." 251 Neb. at 195, 556 N.W.2d at 28. This case differs factually from *Hulett* in that there was only one prior instance of assaultive behavior on the premises, but it involved the same assailant who injured Ratigan. We conclude that this is sufficient to create a genuine issue of material fact as to foreseeability.

This case is distinguishable from *Harvey v. Van Aelstyn*, 211 Neb. 607, 319 N.W.2d 725 (1982), in which we held as a matter of law that despite knowledge that a regular patron had been involved in prior assaults, a tavern owner could not have reasonably foreseen that he would suddenly enter the tavern and assault another patron without warning. Here, it is undisputed that Champion was aware of the confrontation between Smith

and Ratigan Jr. following the pool game and was sufficiently concerned that he asked both men to leave the premises. More importantly, there is evidence that Champion was aware of the fight in the parking lot involving Smith and both Ratigan and Ratigan Jr. for some period of time before he called police, and he admits that he "should have probably" called police earlier. K.D.L. offered no evidence to negate Ratigan's allegations that it failed to employ adequate security personnel and establish or implement safety precautions. Viewing the evidence in a light most favorable to Ratigan, we conclude that K.D.L. did not meet its burden of presenting evidence to establish as a matter of law that it met its duty to exercise reasonable care to prevent Ratigan's injury.

K.D.L. argues that even if its negligence were established, Smith's actions constituted an efficient intervening cause which would preclude its liability as a matter of law. We recently addressed a similar argument in *Sacco v. Carothers, ante* p. 9, 10, 567 N.W.2d 299, 302 (1997), where a dispute between patrons in a tavern culminated in a fight in the parking lot after the men had been told by the bartender to "'take it outside.'" One of the patrons who was seriously injured in the incident contended that the owner of the tavern should have taken steps to prevent his injury. The owner argued that the assaultive behavior of the other patron constituted an efficient intervening cause, and the jury was so instructed. We held that the giving of this instruction was error, based upon the principle that "if the likelihood of the intervening act was one of the hazards that made defendant's conduct negligent—that is, if it was sufficiently foreseeable to have this effect—then the defendant will generally be liable for the consequences." *Id.* at 15, 567 N.W.2d at 304. We held that because the specific risk against which the tavern owner allegedly failed to exercise due care was the likelihood that another patron would assault the plaintiff, the assault by that patron could not be an independent act that would break the causal connection between the owner's negligence and the plaintiff's injury. On the record before us, where Ratigan alleges that K.D.L. was negligent in failing to protect him from the assaultive behavior of Smith, the assault of Ratigan by Smith cannot be considered an efficient intervening

cause operating to break the causal connection between the alleged negligence of K.D.L. and Ratigan's injury.

For these reasons, we conclude that the evidence presented by K.D.L. was insufficient to establish a prima facie showing that it was entitled to judgment as a matter of law, and the district court therefore erred in granting summary judgment. We reverse, and remand for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.