AMERICAN COMMUNITY STORES CORPORATION, A TEXAS CORPORATION, ET AL., APPELLEES, V. M.J. NEWMAN, TRUSTEE, ET AL., APPELLANTS.

441 N.W.2d 154

Filed June 9, 1989.   No. 87-540.

Richard S. McMillin, of Marks & Clare, for appellants.

Theodore J. Stouffer and Kurt F. Tjaden, of Cassem, Tierney, Adams, Gotch & Douglas, for appellees.

HASTINGS, C.J., WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and McGINN, D.J.

HASTINGS, C.J.

This appeal involves three cases consolidated for trial, briefing, and argument. Plaintiffs, tenants under three separate leases for buildings housing grocery stores, filed petitions for declaratory judgments against the defendants, trustees for the landlords of those various premises. Plaintiffs sought a determination as to whether they violated the terms of the individual store leases which prohibit assignment of the leases without the prior written consent of the landlord, but permit subletting without permission.

Defendants counterclaimed for possession based on alleged assignments of the leases without prior written consent. Both parties filed cross motions for summary judgment. Defendants now appeal from the order of the trial court ruling that the

leases had not been violated because no prohibited assignments had been entered into which remained in effect beyond the period which existed for the curing of defaults as provided for in the leases. Summary judgments were granted in favor of the plaintiffs, and defendants' counterclaims were dismissed.

Defendants assign three errors, which, simply stated, allege that the leases had been assigned without permission, which constituted defaults in the terms of the leases. We affirm.

The requirements to sustain a motion for summary judgment are the same whether one party or both parties have moved for summary judgment. *Bohannon v. Guardsman Life Ins. Co.*, 224 Neb. 701, 400 N.W.2d 856 (1987).

Summary judgment is an extreme remedy that should be awarded only when an issue is clear beyond all doubt. It is proper when pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from the material facts, and when the moving party is entitled to judgment as a matter of law. *Five Points Bank v. White*, 231 Neb. 568, 437 N.W.2d 460 (1989); *Schroer v. Synowiecki*, 231 Neb. 168, 435 N.W.2d 875 (1989). In reviewing a summary judgment, this court views the evidence in a light most favorable to the party against whom judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Five Points Bank v. White, supra; Pioneer Animal Clinic v. Garry*, 231 Neb. 349, 436 N.W.2d 184 (1989).

The facts are not particularly complicated, but are somewhat voluminous. However, for our purposes it will suffice to shorten them considerably.

American Community Stores Corporation (ACS), which operated Hinky Dinky stores in Nebraska, held leases with the various landlords on grocery store buildings in Columbus, Auburn, and Omaha. The leases generally were for 20-year terms with options to renew or extend for multiple 5-year leasing periods. Due to labor difficulties, ACS announced sometime in January of 1985 that it was closing its stores in Nebraska. The Columbus store was closed at the beginning of December 1984, and the Auburn and Omaha stores in

mid-February of 1985. Each store was reopened under different management the day after it closed. The Auburn store was reopened and operated by Hinky Dinky Auburn, Inc., the Columbus store was reopened and operated by Russ' Super Foods, Inc., and the Omaha store was reopened and operated by Gro-Mor, Inc.

The agreements between ACS and the various parties were originally structured such that ACS would assign the leases to Nash-Finch Company, a grocery wholesaler, and Nash-Finch would in turn sublease the stores to the operators. Assignment agreements were signed and placed in the files of the companies.

Shortly after the public announcement of the closings, ACS, through its owner, Cullum Companies, Inc., contacted the trustees for the landlords, requesting permission to assign leases to Nash-Finch. In the case of the Columbus store, a representative of Nash-Finch wrote the trustee a letter dated December 31, 1984, giving notice of the assignment between ACS and Nash-Finch effective December 1, 1984, and of the fact that Nash-Finch was subletting the store to Russ' Super Foods.

By separate letter for each store, each letter dated February 8, 1985, one of the trustees for the landlords notified ACS that the landlord did not consent to assignment of the leases for the Auburn and Omaha stores. Furthermore, if ACS proceeded to assign the lease without written consent, the letter was to constitute the notice of default required in article X of each lease. By separate letter also dated February 8, the trustee notified ACS that unless he heard otherwise from ACS within 2 weeks, he would assume that the transfer of the Columbus store to Nash-Finch was by assignment without consent. In the event Nash-Finch's possession was by assignment, the letter was notice of default. Houston E. Holmes, Jr., vice president and general counsel of Cullum Companies, Inc., notified the trustee for the landlords by letter dated February 14, 1985, that the stores would be *sublet*.

Article IX of each of the leases provided in part:

SECTION 1. Tenant may not assign or transfer this lease without the written consent of Landlord first had

and obtained; however, without obtaining such consent, Tenant may sublet the leased premises or portions thereof for purposes and upon provisions not inconsistent with the terms and provisions of this lease.

Article X of the same leases provides:

SECTION 1. If, at any time during the term of this lease . . . (a) Tenant shall default . . . (ii) In the observance or performance of any of Tenant's other covenants, agreements or obligations hereunder for a period of twenty (20) days after Landlord shall have given Tenant written notice specifying such default or defaults . . . Landlord shall have the right, at its election, at any time thereafter while such default or defaults continue, to re-enter and take complete and peaceable possession of the leased premises . . . and to declare said term ended . . . .

In an apparent effort to cure these claimed defaults, Jon Solberg, in-house counsel for Nash-Finch, and Holmes, on behalf of ACS, agreed during a telephone conversation in mid-February that the assignment agreements would be removed from the various files and replaced with subleases.

The term of each sublease ends 2 days prior to the end of ACS's term under the prime lease with the defendants. In addition, Nash-Finch, as sublessee, was granted the right to "exercise the remaining option periods granted by the Prime Lease."

In granting plaintiffs' motion for summary judgment, the trial court made the following findings of fact:

1. That although there may be a question of fact as to whether an assignment was executed and then destroyed prior to closing of the sale, a sublease was executed thereafter and within 20 days of notice of default given by defendant.

2. That the sublease agreement executed is in fact and law a sublease and not an assignment and therefore does not require the consent of the defendant and is not in violation of any provisions of the original lease. This conclusion is based upon the following:

a) The original lease permitted a sublease for all as well as a portion of the leased premises.

b) The sublease expired prior to the term of the original lease thus retaining in the lessee a right of reversion.

c) The lessee retained a right of reentry for a condition broken which is also a right of reversion.

d) The fact that options given to the sublessee would purport to run as long if not longer than the expiration of the original lease is not, as a matter of law, valid so as to make the sublease for the same term as the original lease. The option can only begin to run from the expiration of the basic term of the sublease, not the original lease. Further, the sublessee cannot be granted more than the prime lessee has to offer under the original lease.

Appellants argue that the original assignments are still in effect because there is nothing in the record that the agreements were canceled or altered. They further argue that even though the assignment documents were destroyed, which fact is not disputed, they still bind ACS and Nash-Finch because they were never formally rescinded or the subject of reassignment from Nash-Finch to ACS.

That reasoning is erroneous. In Nebraska, an assignment by a lessee of an interest in a lease which prohibits such assignment without the lessor's consent is ineffective without such consent. *Moritz v. S & H Shopping Centers, Inc.*, 197 Neb. 206, 247 N.W.2d 454 (1976). See, also, *K. & J. Markets, Inc. v. Martin Packing Corp.*, 20 N.J. Super. 515, 90 A.2d 507 (1952); *Karidis et al. v. Trampas*, 207 Ill. App. 302 (1917); *Austin v. Harris & another*, 76 Mass. (10 Gray) 296 (1858). In *Moritz v. S & H Shopping Centers, Inc., supra*, this court stated:

Defendant had no authority to assign the lease without the consent of plaintiff. Such consent was never given or received and defendant's contention that it transferred certain interests in the lease is necessarily immaterial as no valid rights could have been transferred or acquired in the absence of plaintiff's consent.

197 Neb. at 209, 247 N.W.2d at 456.

The assignments between ACS and Nash-Finch were not valid because the landlords refused to consent to them, and therefore they are not still in effect in continuing violation of the leases. It was not necessary for the parties to formally

rescind the assignments or for Nash-Finch to reassign the leases to ACS before the parties could attempt to enter into valid subleases.

Nevertheless, the assignments without consent, even though invalid, were still violations of the covenants in the leases. However, appellants overlook the fact that the leases provided ACS with 20 days to cure a default after being notified of the default by the landlord. This was done if, in fact, the documents later executed were subleases.

In Nebraska, covenants in a lease against assignment or subletting are not favorably regarded by the courts and are liberally construed in favor of the lessee. *Jamson v. Poulos*, 184 Neb. 480, 168 N.W.2d 526 (1969); *Chesnut v. Master Laboratories*, 148 Neb. 378, 27 N.W.2d 541 (1947). This means that the scope of a covenant against assignment will not be enlarged by the courts, and the covenant will not be considered violated by any technical transfer that is not fairly and substantially an assignment. *Chesnut v. Master Laboratories, supra.*

The generally accepted test for determining whether a transfer is an assignment or a sublease is set out in 2 R. Powell, The Law of Real Property, ¶ 246[1] at 372.92-.93 (1986), as follows:

> When the transfer is for the whole balance of the unexpired term, with respect to all of the originally leased premises and on exactly the same terms as those under which the main lessee held the transaction is inescapably an "assignment." When the transfer is for a period shorter than the unexpired balance of the term, and relates to a physical part only of the originally leased premises and is on terms materially different from those stipulated in the main lease, the transaction is inescapably a "sublease." To state the test in a slightly different manner, the question is whether if by the transaction the lessee conveys his entire term, or whether he retains a reversionary interest. If by the transaction the tenant conveys the entire terms and thereby parts with all reversionary interest in the property, the transaction is construed to be an assignment, whereas if there remains a reversionary interest in the estate, it is a

sublease.

Appellants contend that the subleases are really assignments because ACS did not reserve a reversionary interest at the end of the option terms. According to appellants, contrary to the trial court's ruling, the right of reentry for condition broken is not a reversionary interest. See, *Rocklen, Inc. v. Radulesco*, 10 Conn. App. 271, 522 A.2d 846 (1987); *Shadeland Development Corp. v. Meek*, 489 N.E.2d 1192 (Ind. App. 1986); *State v. Meador*, 60 Wash. 2d 543, 374 P.2d 546 (1962); *C. N. H. F., Inc. v. Eagle Crest Dev. Co.*, 99 Fla. 1238, 128 So. 844 (1930); *Davidson v. Minnesota Loan & Trust Co.*, 158 Minn. 411, 197 N.W. 833 (1924); *Sexton v. Chicago Storage Co. et al.*, 129 Ill. 318, 21 N.E. 920 (1889); *Stewart v. Long Island R. R. Co.*, 102 N.Y. 601, 8 N.E. 200 (1886). However, there is authority for the position that the right of reentry is a reversionary interest sufficient to qualify a transfer as a sublease rather than an assignment. See, Restatement (Second) of Property § 15.1, comment *i.* (1977); *Spears v. Canon de Carnue Land Grant*, 80 N.M. 766, 461 P.2d 415 (1969); *Novosad v. Clary*, 431 S.W.2d 422 (Tex. Civ. App. 1968); *Venters v. Reynolds*, 354 S.W.2d 521 (Ky. 1962); *Lebel v. Backman*, 342 Mass. 759, 175 N.E.2d 362 (1961); *Coles Trading Co. v. Spiegel, Inc.*, 187 F.2d 984 (9th Cir. 1951); *Hartman Ranch Co. v. Associated Oil Co.*, 10 Cal. 2d 232, 73 P.2d 1163 (1937); *Saling v. Flesch et al.*, 85 Mont. 106, 277 P. 612 (1929).

We adopt the reasoning of the latter authorities and declare that a right of reentry is a reversionary interest sufficient to qualify a transfer of rights under a lease agreement as a sublease rather than an assignment.

Quite apart from the question of the right of reentry, ACS did retain a reversionary interest by reason of the expiration of the term of the sublease prior to that of the basic lease. It is generally accepted that the retained reversionary interest need not be for a substantial period of time in order for an agreement to be considered a sublease. Agreements calling for the surrender of possession only 1 day prior to the expiration of the term of the main lease have been held to be subleases rather than assignments. See, *Bostonian Shoe Co. of New York v. Wulwick Associates*, 119 A.D.2d 717, 501 N.Y.S.2d 393 (1986);

*F.W. Woolworth Co. v. Plaza North, Inc.*, 493 N.E.2d 1304 (Ind. App. 1986); *Warnert v. MGM Properties*, 362 N.W.2d 364 (Minn. App. 1985).

In each agreement at issue in this appeal, Nash-Finch's tenancy ends 2 days prior to the end of ACS's tenancy under the prime lease. Under the common-law distinction between assignments and subleases, this is a sufficient reversionary interest to constitute the transfer a sublease.

Appellants argue that even though the agreements between ACS and Nash-Finch reserve a portion of the initial term to ACS, the so-called subleases between Nash-Finch and its operators are contractually inconsistent; i.e., the Auburn and Omaha subleases between Nash-Finch and the operators provide for termination of the operator's lease on the same day that ACS's term expires under the prime lease. Appellants insist that this is evidence that the real intent of ACS and Nash-Finch was to assign the leases. Contrary to this contention, it seems only to indicate that the subleases between Nash-Finch and the operators were not changed to reflect the change from assignments to subleases between ACS and Nash-Finch.

In Nebraska, a sublessee has no greater rights against the original lessor than were given by the original sublessor to the original sublessee. Thus, despite the provisions in the subleases between Nash-Finch and the operators of the Omaha and Auburn stores, the tenancy of the operators will end when the term of Nash-Finch ends, 2 days prior to the expiration of ACS's term under the prime lease.

Appellants also contend that ACS transferred the premises for the entire remainder of its term because it granted Nash-Finch the right to exercise the remaining renewal options in the prime lease. It is reasonable to conclude that ACS was granting Nash-Finch options to renew the subleases in order to extend their terms by 5 years each for the number of times ACS could extend the prime lease, rather than granting Nash-Finch the right to actually extend the prime lease pursuant to ACS's option to renew. Since under a sublease there is no privity of contract between the original lessor and the sublessee, Nash-Finch as sublessee could not exercise ACS's option to renew. See, generally, *Neal v. Craig Brown, Inc.*, 86 N.C. App.

157, 356 S.E.2d 912 (1987); *Ducote v. Callico*, 307 So. 2d 644 (La. App. 1974); 50 Am. Jur. 2d *Landlord and Tenant* § 1195 (1970); Annot., 39 A.L.R.4th 824 (1985).

In *F. W. Woolworth Co. v. Plaza North, Inc., supra*, the court found that an agreement which allowed the transferee to occupy the premises during the extended period of a renewable prime lease permitting the original lessee to extend the lease for five successive terms of 5 years, which gave the transferee options to extend, and which expired 1 day before the expiration of the second and third extended periods of the prime lease, was a permitted sublease and not a prohibited assignment. The facts in that case as to the extension options are strikingly similar to the instant case.

To the same effect is *Joseph Bros. Co. v. F. W. Woolworth Co.*, 641 F. Supp. 822 (N.D. Ohio 1985), *aff'd* 844 F.2d 369 (6th Cir. 1988). The issue also facing that court was whether the agreement constituted an assignment or a sublease. According to the court,

> [t]he effect of the agreement was that each term of the Woolco-Hills agreement expired one day before the expiration of the corresponding term of the Joseph Brothers-Woolco agreement. If each party extended its lease to the limits, the Joseph Brothers-Woolco lease would expire one day after the Woolco-Hills lease.

*Id.* at 824.

The court noted that once a lease renewal option has been exercised, the term of the original lease is deemed to be enlarged to encompass the option period. Therefore, the issue was whether the same was true if a sublease is entered into before the renewal option is exercised. The court found that Woolco clearly acted with the intention in good faith of exercising its option to extend the lease, evidenced by the fact that Woolco did so 1 month after the agreement with Hills and 5½ years before it was necessary. Accordingly, the court found that "reasonable minds could only conclude that it was the intention of Woolco to sublease the premises to Hills, that Woolco made a good faith attempt to enter into a sublease, and that the agreement meets the legal requirements to constitute it as a sublease rather than an assignment." *Id.* at 825.

Recently, this court in *International Harvester Credit Corp. v. Lech*, 231 Neb. 798, 438 N.W.2d 474 (1989), reiterated the well-established law in this state that "the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence." *Id.* at 803, 438 N.W.2d at 478, quoting *Nowak v. Burke Energy Corp.*, 227 Neb. 463, 418 N.W.2d 236 (1988). ACS and Nash-Finch, while engaged in the performance of the agreements, appear to have interpreted the renewal option to mean Nash-Finch will inform ACS if it wishes to extend the term and ACS in turn will then exercise its option under the prime lease by notifying the landlord. Nash-Finch's right to extend the subleases is dependent upon ACS's exercise of its options to renew the prime leases. The effect is that each term of the subleases expires 2 days before the expiration of the corresponding term of the prime lease. If ACS and Nash-Finch each extend their leases to the limits, the prime leases will expire 2 days after the subleases.

Appellants cite to this court the rule of *Jaber v. Miller*, 219 Ark. 59, 239 S.W.2d 760 (1951), that the intention of the parties is to govern in determining whether an instrument is an assignment or a sublease. According to appellants, if this court follows the *Jaber* rule, the intention of the parties is a question of fact, and therefore summary judgment was inappropriate.

Tennessee also follows the intention rule. The court in *Ernst v. Conditt*, 54 Tenn. App. 328, 390 S.W.2d 703 (1964), quoting *Williams v. Williams*, 84 Tenn. 164 (1885), stated, " 'We have most wisely abandoned technical rules in the construction of conveyances in this State, and look to the intention of the instrument alone for our guide, that intention is to be arrived at from the language of the instrument read in the light of the surrounding circumstances.' " 54 Tenn. App. at 337, 390 S.W.2d at 707. Furthermore,

> "It is the duty of the court in the construction of contracts to ascertain the intention of the contracting parties, understand what they meant by the contract, and give effect to such understanding and meaning. All other rules of construction are only aids or helps in establishing the

intention of the parties and their mutual understanding of the meaning of their contract.

"The motives which induced the contract have a definite bearing upon the intention of the parties. The object and purpose to be effected furnish valuable aids in ascertaining such intention."

*Ernst*, 54 Tenn. App. at 337-38, 390 S.W.2d at 707, quoting *Commerce Street Company v. Goodyear Tire & Rubber Company*, 31 Tenn. App. 314, 215 S.W.2d 4 (1948).

Reading the language of the agreements between ACS and Nash-Finch in the light of the surrounding circumstances and taking into consideration the motives which induced the agreement, the only reasonable interpretation of the agreements is that they are and were intended to be subleases. ACS was informed that the landlord would not consent to assignments and considered ACS to be in default. ACS, having the object and purpose of transferring its interest in the premises while not violating the leases and forfeiting its interest in the premises, clearly intended to enter into subleases, which it could do without permission. To this end, ACS entered into agreements that satisfy the common-law requirements of a sublease.

There is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn therefrom, and the appellees are entitled to judgment in their favor as a matter of law. The judgments of the district court are affirmed.

AFFIRMED.