LLOYD HOWARD AND JOY HOWARD, AS MOTHER AND NEXT FRIEND OF KATHRYN HOWARD, APPELLANTS, V. BLUE CROSS BLUE SHIELD OF NEBRASKA, APPELLEE.

494 N.W.2d 99

Filed January 8, 1993.    No. S-89-1452.

Robert W. Mullin, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for appellants.

John F. Thomas and Geoffrey V. Pohl, of McGrath, North, Mullin & Kratz, P.C., and James W. Ellison, of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, P.C., for appellee.

Donald F. Evans and Lyman L. Larsen, of Kennedy, Holland, DeLacy & Svoboda, for amicus curiae Health Insurance Association of America.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

HASTINGS, C.J.

Appellants, Lloyd Howard, an employee of the city of Kimball since 1973, and his wife, Joy, as mother and next friend of their daughter, Kathryn Howard, brought this action on September 18, 1989, against Blue Cross Blue Shield of Nebraska (BCBS). The amended petition for declaratory judgment alleges Lloyd Howard's employment, the issuance by defendant of its group sickness and health policy to the city of Kimball, and the birth on May 24, 1984, of Kathryn, who was afflicted with the congenital defect known as spina bifida. It is further alleged that the policy contained major medical benefits of a lifetime maximum limit of $1,000,000 and that BCBS paid benefits for medical and hospital treatment (in excess of

$60,000 according to the testimony of Joy Howard) until June 30, 1985, at which time the policy was terminated by BCBS and the city of Kimball without the consent of the plaintiffs. Plaintiffs then allege that BCBS contends the policy excludes coverage for services rendered after the effective date of the termination of the policy, that no conversion privilege exists, and that although demand was made on BCBS by the plaintiffs to extend coverage, the demand was refused. The amended petition concludes with a prayer for the declarations of the rights of the parties. Both parties moved for summary judgment. The trial court sustained the motion of BCBS, which action precipitated this appeal by the plaintiffs.

The minutes of the meeting of the city council of the city of Kimball show that on May 14, 1979, the Howards were included on the existing BCBS policy of the city of Kimball in lieu of a salary increase. According to the February 5, 1985, minutes of the city council meeting, BCBS gave notice that as of March 1, 1985, there would be an increase of 31.9 percent in the city's premiums for the health care policy for the ensuing year. The answers to interrogatories filed by BCBS reflect that the expenses paid relating to Kathryn Howard accounted for 38 percent of the total claims paid for the city of Kimball under the group policy then in force. The city council discussed "self-funding" of health insurance at the March 5, 1985, meeting. On March 19, 1985, the city received bids from other insurers for group insurance. The Howards, particularly Joy Howard, were in touch with both the mayor and city council regarding the loss of BCBS coverage. The minutes of the April 16, 1985, meeting of the city council reveal that the city council voted to pay the premium on the BCBS policy for another month. The proposal of New York Life Insurance Company to furnish group health insurance to the city was accepted at the council meeting of June 4, 1985.

The city terminated its group health policy with BCBS on June 30, 1985, and switched its insurance company to New York Life in an effort to reduce premium expenses. New York Life carried a cap of $100,000 on lifetime benefits for claims as a result of a preexisting condition. BCBS' cap (Kathryn Howard's condition was not considered by BCBS to be

preexisting) was $1,000,000. While Lloyd Howard could have converted his original policy, he would have been required to quit his job, and the coverage would have been reduced to $25,000 of lifetime benefits. BCBS stopped paying benefits to the Howard family effective with the termination of the policy.

Appellants, in summary, claim that the district court erred in granting appellee's motion for summary judgment and not appellants' motion and in determining that the insurance policy in question was not ambiguous on the issues of (1) whether it was a contract of indemnity for services rendered during the life of the policy or a sickness and accident policy extending coverage for medical expenses or charges which result from sickness and accident; (2) its definition of services, covered services, and covered condition and the language of the termination provisions; (3) the specific extension of coverage for the care and treatment of birth defects and the insuring language which states that appellee agreed to pay for "services" as described in the policy; and (4) whether the policy extended lifetime coverage of $1,000,000 for medical catastrophes and permitted cancellation, termination, or modification after the catastrophe had occurred.

In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Anderson v. Service Merchandise Co.*, 240 Neb. 873, 485 N.W.2d 170 (1992); *Spittler v. Nicola*, 239 Neb. 972, 479 N.W.2d 803 (1992).

Moreover, summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Hanson v. General Motors Corp.*, 241 Neb. 81, 486 N.W.2d 223 (1992); *Barelmann v. Fox*, 239 Neb. 771, 478 N.W.2d 548 (1992); *Flamme v. Wolf Ins. Agency*, 239 Neb. 465, 476 N.W.2d 802 (1991); *Flynn v. Bausch*, 238 Neb. 61, 469 N.W.2d 125 (1991).

A party moving for summary judgment has the burden to show that no genuine issue of material fact exists and must

furnish sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law if the evidence presented for summary judgment remains uncontroverted. After the moving party has shown facts entitling it to a judgment as a matter of law, the opposing party has the burden to present evidence showing an issue of material fact which prevents a judgment as a matter of law for the moving party. *Spittler v. Nicola, supra; Flamme v. Wolf Ins. Agency, supra.*

Before addressing the merits of this appeal, we acknowledge that the insurance policy must be read in its entirety and that the words must be given their plain and proper meaning. It should be read to avoid ambiguities, if possible, and the language should not be tortured to create them. *Jefferson v. State Farm Ins.*, 380 Pa. Super. 167, 551 A.2d 283 (1988); *Monti v. Rockwood Ins. Co.*, 303 Pa. Super. 473, 450 A.2d 24 (1982). See, also, *Bartulis v. Metropolitan Life Ins. Co.*, 72 Ill. App. 2d 267, 218 N.E.2d 225 (1966). A provision is ambiguous only if reasonably intelligent persons considering it in the light of the entire policy could honestly differ as to its meaning. *Jefferson v. State Farm Ins., supra; Adelman v. State Farm Mut. Auto. Ins. Co.*, 255 Pa. Super. 116, 386 A.2d 535 (1978). A court may not create ambiguity merely to afford coverage where a clear reading of the policy would otherwise deny coverage. *Safeco Ins. Co. of America v. Husker Aviation, Inc.*, 211 Neb. 21, 317 N.W.2d 745 (1982).

In determining whether the insurance policy in question was indeed ambiguous on the issues of whether it was a contract of indemnity for services rendered during the life of the policy or a sickness and accident policy extending coverage for medical expenses or charges which result from sickness and accidents occurring during the life of the policy, we refer to the very letter of the policy, and we find that the BCBS policy is one covering services rendered.

The cover page of the master contract provides as follows:

Starting at 12:01 A.M. at the Applicant's office on the date stated in the Application, and in consideration of the attached Application and payment of the charges as provided, THE COMPANY AGREES TO MAKE PAYMENT for the services as described, defined and

limited herein, *during the term of this Contract.* (Emphasis supplied.)

Part XII of the policy, relating to hospital services except pregnancy, provides as follows:

**A. INPATIENT SERVICES:**

**1. Member Hospitals:** If, because of Illness or Injury a Covered Person is an Inpatient in a Member Hospital, payment will be made for services which are billed by the Hospital as a regular Hospital service:

. . . .

**B. OUTPATIENT HOSPITAL SERVICES AND FREE STANDING AMBULATORY SERVICES:**

1. Payment will be made for services of a Hospital for Outpatient Services . . . .

Part XIII covers payment for a doctor's services:

**A. DETERMINATION OF PAYMENT:**

1. Payments made under this Part for services in Nebraska will be based on the Usual, Customary and Reasonable charge.

2. Payments made under this Part for services not in Nebraska will be based on the Usual, Customary and Reasonable charge for the area where done if such data is available to the Company. . . .

The policy goes on to refer consistently to payment for "Covered Services," for a "Covered Person," and for a "Covered Condition."

In discussing exclusions, the policy remains consistent with the theory of payment for services rather than for expenses arising out of a particular occurrence. Part II of the contract states: **"PART II. EXCLUSIONS AND LIMITATIONS A. EXCLUSIONS:** No payments shall be made under this Contract, except as expressly stated herein, for: . . . . 5. Services provided: . . . . c. Any Covered Person before their effective date of coverage, or after their termination."

Part IV of the policy provides that premium charges are due and payable monthly in advance, that a 31-day grace period is provided for, but that if payment is not received during that period, "this Contract shall end as of Midnight of the last day for which charges have been paid."

156

Finally, at part V, the policy provides in part as follows:

C. The Company may cancel this Contract at any time by written notice to the Applicant under Part III, Paragraph H., stating when, not less than 5 days later, the cancellation shall be effective. After this Contract has been in effect one year, the Applicant [City of Kimball] may cancel this Contract at any time by written notice to the Company, effective upon receipt or on such later date as may be stated in the notice. Thereupon, the Company will return the unearned portion of any dues paid, computed pro rata. Cancellation shall not affect any claim for *services provided* before the effective date of cancellation.

D. If this Contract is cancelled or terminates or if Applicant executes a contract with another health care carrier or becomes self-insured, no conversion privileges shall apply.

(Emphasis supplied.)

The above-quoted language from the policy itself would seem to leave little doubt that this policy covers services rendered and not occurrences, and once the contract is terminated, in this case canceled by the city of Kimball, the only claim available to a subscriber such as Howard is "*for services provided* before the effective date of cancellation." This language is clear and unambiguous.

As to the Howard's complaint that BCBS afforded no conversion privileges, the contract explicitly provides for the situations in which conversion privileges apply. BCBS was not required to advise the Howards that they had a right to convert their policy, because the policy had been voluntarily terminated, and thus, they had no right of conversion. "If this Contract is cancelled or terminates or if Applicant executes a contract with another health care carrier or becomes self-insured, no conversion privileges shall apply." The assignment of error is without merit, and we consider it no further.

We next address whether the BCBS policy's definitions of services, covered services, and covered condition and the language of the termination provisions were ambiguous: "**5.**

**Covered Condition:** Illness, Injury or Pregnancy for which this Contract provides payment. **6. Covered Services:** Medical care, treatment, and facilities for a Covered Condition for which this Contract provides payment."

While the word "services" is not identified in the definitional portion of the contract, the context in which the word was used was an elaboration of the policy's coverage. For the Howards to find an ambiguity and to subsequently misinterpret the use of "services" over "covered services" to the end that they believed that BCBS would continue to pay their daughter's medical expenses after termination of the policy is without any reasonable foundation. The assignment of error is without merit.

Equally unambiguous were the provisions promulgating the specific extension of coverage for the care and treatment of congenital defects, as well as the insuring language which stated that appellee agreed to pay for services as described in the policy. Again, the policy clearly states that it provides $1,000,000 of lifetime maximum coverage for the care and treatment of conditions, which definitionally would include Kathryn Howard's congenital defects. Upon the employer's voluntary termination of the policy, however, the coverage ceased.

Like most group hospitalization policies, this policy did not cover hospital and surgery expenses of the insured incurred after the policy had expired for injury sustained by the insured while the policy was still in force. See *Bartulis v. Metropolitan Life Ins. Co.*, 72 Ill. App. 2d 267, 218 N.E.2d 225 (1966). In *Bartulis*, the Illinois Appellate Court held:

> We cannot agree with the plaintiff that liability arose when the injuries were sustained. The coverage was not for expense caused by injuries sustained during the life of the policy, but for the cost of hospitalization and surgery obtained during the life of the policy. We recognize the rule that insurance contracts are construed in favor of the insured, but construction does not degenerate into a perversion of plain language to create an ambiguity where none exists or to father a contract obligation where none is stated or reasonably implied. Miller v. Madison County

Mut. Automobile Ins. Co., 46 Ill App2d 413, 197 NE2d 153; Thompson v. Fidelity & Casualty Co. of New York, 16 Ill App2d 159, 148 NE2d 9. Nor does either justice or public policy compel a different result. Such argument is effectively answered in Shelton v. Equitable Life Assur. Society of the United States, 28 Ill App2d 461, 468, 171 NE2d 787, 790, with these words: "Plaintiff argues in effect that the ninety-day provision should be ignored so that justice can be served. We know of no public policy justification for ignoring the language of a contract in order to impose liability of a defendant insurer for a loss not contemplated by the contract. The ninety-day period provision allows a reasonable time for the manifestation of losses caused by accidental injury. Moreover, defendant contracted to pay only for losses occurring within ninety days after injury."

*Bartulis*, 72 Ill. App. 2d at 271, 218 N.E.2d at 226-27.

Finally, we address whether the policy extended lifetime coverage of $1,000,000 for medical catastrophes and permitted cancellation, termination, or modification after the catastrophe had occurred.

While the policy does provide for $1,000,000 of lifetime coverage for medical catastrophes, nowhere in the policy exists a colorable claim that termination, cancellation, or modification was permissible so as to still retain that coverage. Insurance companies clearly base their premium rate on a calculation of their risk. To leave themselves open to risk after termination of policy is not factored into the premium rates; to require them to do so would certainly create an undue burden, not only upon the insurance industry, but ultimately upon all policyholders, the very ones who pay the premiums, be it directly or indirectly. The BCBS contract clearly provides that provided services would not be covered after the date of termination of coverage, the end of the period for which premiums had been paid. Appellants essentially contend that since the policy states that it would not pay for services after termination and did not specify covered services, an ambiguity was created. This contention is totally without merit.

The trial court's findings consisted of the following:

It's . . . my opinion there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. One major consideration is the fact in this case that it was the policyholder, after full, deliberate and considered study, that made the determination to end coverage and to stop the provision of insurance by the defendant, and it seems to me that that is the cause. They knew what the coverage was from that company because of, well, I think four years experience or whatever it was with them, and it was — that was the cause of the loss of coverage. I don't agree that the policy behind the legislative change for policy language on congenital birth defects and coverage for newborns is as broad as is being urged by the plaintiff. I think it was more limited. I think the effect of the public policy expressed in that statute was to require that coverage begin at the moment of birth which occurred in this case, and that policies not wiggle out of that on the claim of preexisting condition, because a congenital defect is a preexisting condition, no matter when the person becomes a covered individual, but it does more than that, and that those policies were furthered by the facts of this case, and the reason they were furthered was that coverage existed at the moment of birth, continued throughout the time without any delays for preexisting condition, and stopped only because of the voluntary action of the policyholder, not on the part of anything that was the fault of the defendant. That's what I think decides this case. So that's my decision, and those are the reasons.

As this court has held before, parties to an insurance contract may make the contract in any legal form they desire, and in the absence of statutory provisions to the contrary, insurance companies have the same right as individuals to limit their liability and to impose whatever conditions they please on their obligations, not inconsistent with public policy. If such exceptions and limitations are plainly expressed, insurers are entitled to have them construed and enforced as expressed. *Safeco Ins. Co. of America v. Husker Aviation, Inc.*, 211 Neb. 21, 317 N.W.2d 745 (1982).

It is clear that the city of Kimball elected to terminate its group BCBS policy to save money, despite the obvious and devastating repercussions the Howards would suffer. BCBS had no alternative but to accept the action of the city. An insurance company cannot be expected to continue to pay out claims to the Howards or to any former subscriber, especially when it was indeed the city, the employer, that made the affirmative decision to terminate the policy. This lawsuit is not against the city of Kimball for breach of contract.

This policy is clearly one covering expenses for services and is not an accident policy, and thus recovery must be denied, for "[i]nsurance is a matter of contract, not sympathy." *St. Paul Fire & Marine Insurance Company v. Purdy*, 129 Ga. App. 356, 357, 199 S.E.2d 567, 569 (1973). See, also, *Wulffenstein v. Deseret Mut. Ben. Ass'n*, 611 P.2d 360 (Utah 1980).

The Howards argue that Neb. Rev. Stat. § 44-709 (Reissue 1988) becomes a part of the insurance contract under consideration and binds BCBS. That section states as follows: "The term sickness and accident insurance, or accident and sickness insurance as used in sections . . . is defined as insurance against loss or expense resulting from the sickness of the insured, or from the bodily injury or death of the insured by accident, or both."

However, immediately following that citation in their brief, the Howards refer to Neb. Rev. Stat. § 44-710.19 (Reissue 1988), which on its face contradicts their reliance on § 44-709. Section 44-710.19 provides in part as follows:

(1) All individual and group health insurance policies *providing coverage on an expense incurred basis* and individual and group service or indemnity type contracts, which provide coverage for a family member of the insured or subscriber shall, as to such family members' coverage, also provide that the health insurance benefits applicable for children shall be payable, with respect to a newly born child of the insured or subscriber, from the moment of birth.

(2) The coverage for newly born children shall consist of coverage of injury or sickness including the necessary care and treatment of medically diagnosed congenital

defects and birth abnormalities.
(Emphasis supplied.)

This latter section merely requires that any policy in force as to a covered newborn child shall provide coverage in the same manner that it does for the other family members. There is nothing about that section nor the previously cited section that changes a services-incurred policy into an occurrence policy.

Based upon the foregoing, no genuine issue of material fact is in dispute and BCBS was entitled to judgment as a matter of law. The judgment of the district court was correct and is affirmed.

AFFIRMED.

WHITE, J., dissenting.

The majority states that when "read in its entirety," the insurance policy at issue, including the provisions that strip Kathryn Howard of care benefits, is "unambiguous." However, the majority does not acknowledge that based on its reading, the policy is utterly misleading—intimating "lifetime" coverage while binding BCBS to an illusory coverage obligation. I believe that a genuine issue of material fact exists regarding the reasonableness and effect of BCBS' premium increase and that summary judgment was inappropriate. I therefore dissent.

I agree with the majority that the policy language makes clear that only "services" are covered by the contract. The contract is ambiguous, however, as to when those services are covered. Throughout the policy there are frequent references to "termination" and "cancellation." The policy gives both parties the power to cancel the contract and refers to the instances giving rise to termination. In its brief, BCBS even cites authority distinguishing the two terms.

However, when the policy refers to exclusions, cancellation is not mentioned: "**A. EXCLUSIONS:** No payments shall be made under this Contract, except as expressly stated herein, for . . . Services provided [to a]ny Covered Person before their effective date of coverage, or after their *termination*." (Emphasis supplied.)

If the policy is given a literal reading, as is demanded by the majority, only a termination would absolve BCBS from

fulfilling its policy obligations to Kathryn Howard. The question then becomes: Did the Howards' coverage cease because of a termination or because of a cancellation? Based on the authority cited by BCBS, cancellation relates to the insurer's taking action to end coverage before coverage would otherwise end under the terms of the contract. Termination, on the other hand, refers to coverage ceasing pursuant to the terms of the contract. See *Mezzacappo v. Travelers Ins. Co.*, 523 So. 2d 291 (La. App. 1988). The policy itself does not draw such a fine distinction; part V(C) gives the insured, as well as BCBS, the power to "cancel" the policy.

Although coverage ceased when the city of Kimball failed to renew the yearly contract, I do not believe this is dispositive on the question of whether the contract ended by termination or by cancellation. I believe there is a genuine issue of material fact as to whether the 32-percent premium increase by BCBS constituted a constructive cancellation of the contract and effectively forced the city of Kimball to find another carrier.

Neither am I convinced that the 1-year renewable nature of the contract freed BCBS to raise premium rates to any level it chose, regardless of the effect on the city of Kimball and its employees. Faced with a similar policy, the court in *Danzig v Dikman*, 78 A.D.2d 303, 309, 434 N.Y.S.2d 217, 220-21 (1980), noted:

> [T]he existence of a lifetime maximum [benefit provision] (whether limited or unlimited) discloses an awareness on the part of the insurer and all interested parties that an illness or condition might well continue indefinitely beyond any one contract term and, indeed, persist for the lifetime of an individual subscriber or his or her beneficiary.

See, also, *Myers v. Kitsap Physicians Serv.*, 78 Wash. 2d 286, 474 P.2d 109 (1970) (holding that the phrase "life of the contract" could mislead the average purchaser of insurance as to the extent of coverage under a 1-year renewable policy).

I agree with the *Danzig* court and find that the $1,000,000 "Total Lifetime Maximum" provision in the BCBS policy indicates an expectation by the parties that the contract would extend more than one policy term. As such, I believe that BCBS

should not be able to constructively cancel the contract through exorbitant premium increases. See *Cataldie v. Louisiana Health Service & Indem.*, 456 So. 2d 1373 (La. 1984) (holding that an insurer could not limit incurred liability by constructively canceling the policy).

BCBS may argue that under the contract it had a right to raise rates at the end of each year. While it would be ludicrous to suggest that an insurance company can never raise premiums, when the language of the contract indicates that the parties expect extended coverage, the insurer should not be able to grossly inflate its rates to escape an unfavorable contract. In *Lutsky v. Blue Cross Hosp. Service, Inc.*, 695 S.W.2d 870 (Mo. 1985), the Supreme Court of Missouri examined the implications of policy provisions similar to those now relied on by BCBS. The court stated:

> The defendants [insurers] point out . . . that the contractual documents state very clearly that the benefits payable are only such as are provided by the contracts in effect at the time the expenses are incurred. . . .
>
> If the defendants are correct, then the provision for $1,000,000 lifetime benefits per person is illusory to the point of being positively deceptive. This provision might lead members to believe that they would be protected against catastrophic and prolonged illness which strikes all too often without warning, whereas, by the defendants['] contentions, the protection would continue only so long as the insurer and the sponsor did not change the coverage. By the defendants' argument, indeed, modifications could be made in order to forestall further payments on account of an existing disability. Such a state of affairs, at the very least, is occasion for a raising of the judicial eyebrow.

*Id.* at 874-75.

An additional factor indicates that BCBS should not be free to constructively cancel the contract—the Howards' detrimental reliance on the policy. Several courts, usually dealing with pregnancy expenses, have cited a public policy against revoking the insurance coverage of an individual who, after incurring expenses in reliance on the coverage, has become

effectively "uninsurable." See, e.g., *Providence Hosp v Morrell*, 431 Mich. 194, 427 N.W.2d 531 (1988); *Brown v. Blue Cross & Blue Shield of Miss.*, 427 So. 2d 139 (Miss. 1983).

To a greater extent than in most sickness or injury cases, the Howards relied on this policy. While no one drives recklessly *because* they have accident insurance, the Howards actually planned the conception of their child based on the BCBS policy. They waited the requisite 270-day period before conceiving, obviously intending to have maternity expenses covered.

Although pregnancy expenses were probably foremost in the Howards' plans, it is not unreasonable to presume that they also relied on the policy for the unfortunate possibility that something could be wrong with their child. They took the steps necessary to qualify for the plan, and the record does not indicate that they purchased any supplemental insurance to cover this contingency. Why would they, when they were supposedly covered by a million-dollar policy?

This reliance, no doubt engendered by the misleading "lifetime maximum" provision, should estop BCBS from constructive cancellation through unreasonable premium increases. As noted before, BCBS increased premiums 32 percent in one policy period. A fact question exists as to the propriety of this increase, and summary judgment was therefore improper. A letter from BCBS explaining the increase is part of our record. However, the reasonableness of the increase was never resolved because the trial court erroneously granted summary judgment.

In spite of the many cases that have extended coverage to posttermination expenses, there are at least an equal number that have not. Most of these cases note that the parties to the contract are free to set the terms as they wish, and if those provisions allow the coverage to be cut off, even on the mere whim of the employer and insurer, then those parties should be free to do so. I posit that these cases refuse to acknowledge the parties who matter—the insured workers and their families. Contrary to the position of the majority, "fairness" is not a four-letter word. It is said that hard facts make bad law, but if unconscionable facts find no remedy in the law as it stands, then the law must change.

It is ironic that as courts stretch the limits of policy language to determine whether the insured's rights are vested, the insurers make certain that the policy language becomes tighter, more complex, and ultimately, more difficult for the nonlawyer to understand. The process forgets just who it is that relies on these policies: not the insurer, not the city, not the lawyers or the judges. The ones who rely are people like Lloyd and Joy Howard.

Insurance is based on the spread of risk. BCBS simply spreads the risk of premium payment over the insured group, here, over the employees of the city of Kimball. As payments go out, rates go up; the smaller the group, the higher the individual premium. Lloyd Howard's only fault was working for a governmental subdivision too small to absorb the increased premiums, and the only risk that the BCBS policy effectively guarded against was that the company would lose money on the contract.

The irony is that the risk will be spread anyway—to the general populace. When the new insurance policy's limit is reached, the Howards will inevitably be forced to deplete their income and savings until they qualify for Medicaid, whereupon the taxpayers will have to cover the cost.

While I believe that the language of the policy should prevent BCBS from exorbitantly raising its premiums, I also feel that the city of Kimball is the true villain in this tragedy. BCBS points out that when shopping for substitute coverage, the city of Kimball received a proposal from another insurance company that would have covered Kathryn Howard's disabilities up to $1,000,000, an amount equal to the BCBS coverage. The city of Kimball rejected that proposal and instead purchased a policy reducing Kathryn Howard's coverage by $900,000. In my view, however, this fact does not automatically legitimize BCBS' actions. I still believe that summary judgment was improper.

A majority of this court holds that coverage will not be extended to Kathryn Howard's future medical needs. For the reasons I have set out above, I dissent. I note, however, that if this court cannot provide relief for those in the unfortunate situation encountered by the Howards, perhaps the Legislature

will. Faced with a similar dilemma, the Supreme Court of Louisiana stated:

> If relief is to be made available to persons like [the insured] who suffer unfortunate and debilitating injury or illness which leads to . . . termination of their insurance, it must come from the legislature. As a matter of public policy, the legislature might require continued coverage of all risks which materialize prior to the cessation of an insured's membership in a group.

*Massachusetts Mut. Life Ins. v. Nails*, 549 So. 2d 826, 832 (La. 1989).

Another possibility would be to place stricter limits on the ability of state subdivisions to modify, without consent, employee insurance coverage. Even rules requiring better disclosure would help, for I am sure that if Lloyd and Joy Howard had been made aware that the city of Kimball and BCBS could unilaterally strip them of their "insurance," the Howards would have considered supplemental coverage. I do not pretend to have the solution to this problem. I do know, however, that it needs to be addressed, or others will face the same misfortune.

SHANAHAN, J., joins in this dissent.