MIKE ANDREASEN ET AL., APPELLANTS, V. WILLIAM GOMES, M.D., ET AL., APPELLEES.

504 N.W.2d 539

Filed August 27, 1993.   Nos. S-90-740, S-90-984.

Sam Grimminger for appellants.

Mark A. Christensen, of Cline, Williams, Wright, Johnson & Oldfather, for appellees William Gomes, M.D., and Grand Island Clinic, Inc.

David A. Svoboda, of Kennedy, Holland, DeLacy & Svoboda, for appellees Gary Settje, M.D., and Family Practice of Grand Island, P.C.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

PER CURIAM.

Mike and Tina Andreasen and their two children, Micki Lea and Amy Marie, instituted separate actions against two doctors and their respective employers for emotional injuries resulting from the stillbirth of Mike and Tina's baby. These two cases have been consolidated for purposes of briefing and argument. The petitions allege that the negligent conduct of the defendants, William Gomes, M.D.; Gary Settje, M.D.; and their respective employers, caused the stillbirth. In each instance, the trial court sustained motions for summary judgment in favor of the defendants. The plaintiffs contend that the trial court erred because the record indicates that genuine issues of material fact exist. We affirm each of the judgments.

Settje, a general practitioner, provided Tina with prenatal medical care throughout her pregnancy. After experiencing severe abdominal pains, Tina, at approximately 7 a.m. on January 3, 1989, was admitted to a hospital. She was concerned

because when she awoke that morning, she did not feel the fetus move. Although the birth was not to occur for another month, she believed she was in labor.

Settje arrived at the hospital between 8 and 8:15 a.m. An external fetal heart monitor was installed, and shortly thereafter, Settje came in. After looking at the monitor, he notified the expectant parents that the fetus might be losing some oxygen. At approximately 8:26 a.m., complications developed. Settje informed Mike and Tina that he would send a fetal monitoring strip to Omaha to Dr. Michael G. Levine, a specialist in maternal fetal medicine. Unknown to Mike and Tina, Levine, after reviewing the monitoring strip, recommended a cesarean section between 9:33 and 9:37 a.m. Outside the room, Settje also consulted with Gomes, an obstetrical gynecologist. Gomes then entered the labor room wanting to know why everyone was so "excited." Settje did not return to the room, and Mike and Tina did not see him until after the delivery.

Mike and Tina became concerned over the apparent disagreement between the doctors, but did not question their actions. According to Mike and Tina, there also appeared to be some disagreement in the interpretation of the monitor readings between Gomes and the attending nurse, Janet Spale. In order to obtain improved readings, Gomes decided to place an internal monitor on the fetus. Because of unclear readings, and after an attempt to replace a component, the internal monitor was replaced. After this was done, Gomes left, and Spale continued to monitor the readings.

After a short while, Spale stated she had to "go get" Gomes. Upon his arrival, Gomes glanced at the monitor and said, "[L]et's go." Mike stated he noticed the fetal heart monitor stop immediately prior to his wife being wheeled into the operating room. He signed the consent forms needed to perform surgery and waited in the labor room.

The cesarean section was performed at approximately 10:49 a.m., and the stillborn fetus was delivered at approximately 10:50 a.m. When Settje notified Tina of the stillbirth approximately 1 1/2 hours after the delivery, she stated she already knew because she had heard the baby's heart stop prior

to going into surgery.

Mike was notified of the stillbirth soon after the delivery. Later that evening, he went to pick up his children from the babysitter's home and told them of the stillbirth.

Approximately 6 weeks later, while on a scheduled visit with Gomes, Tina learned of Levine's recommendation. When Tina questioned Gomes about his failure to follow Levine's recommendation, Gomes responded, "[B]ut who was Mike Levine? Does he think he's God? Am I supposed to listen to everything that he says?"

Dr. Richard Fields, a specialist in obstetrics and gynecology, stated that the need for a cesarean section was identifiable by 8:10 a.m. By 9:50 a.m., when Gomes arrived, the operation should have been performed.

*Haselhorst v. State*, 240 Neb. 891, 485 N.W.2d 180 (1992), and *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109 (1985), permit recovery under appropriate circumstances for the emotional distress suffered by a bystander who witnesses or gains knowledge of the death or serious injury of another proximately caused by the negligence of a defendant.

The manner in which the stillbirth came about is such that a finder of fact could, if it so wished, reasonably find that the defendants were negligent. We thus direct our attention to other matters.

Turning first to the children's claim, we note that among the factors to be considered in bystander liability cases is the relationship between the party harmed and the party claiming to have been distressed by the harm. *Haselhorst, supra*; *James, supra*. We have also said that a marital or familial relationship is required in order to bring bystander liability into play. *Id*.

Although the children knew of the impending birth of a sibling, given their ages, 4 and 7, the relationship between them and the fetus was, as a matter of law, not sufficiently developed to be regarded as an intimate familial one. The children simply lacked the life experiences required to enable them to appreciate the consequences of a stillbirth.

That brings us to Mike and Tina's claim. They claim that they have suffered emotional distress manifested by headaches, nightmares, loss of sleep, and nausea, which an expert

characterized as constituting "severe emotional distress." But to be actionable, the emotional distress must have been so severe that no reasonable person could have been expected to endure it. *Sell v. Mary Lanning Memorial Hosp.*, 243 Neb. 266, 498 N.W.2d 522 (1993); *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 731, 496 N.W.2d 914 (1993); *Schleich v. Archbishop Bergan Mercy Hosp.*, 241 Neb. 765, 491 N.W.2d 307 (1992).

In *Parrish*, the plaintiff's emotional distress manifested itself in crying and headaches. We ruled that the plaintiff had failed to establish a prima facie case because there was not " 'emotional distress' sufficiently severe and medically significant to be actionable under Nebraska law" and noted that "[n]othing indicates that Eldon Parrish's death had an *extraordinary* effect, either psychological or physical, on Julie Parrish." (Emphasis supplied.) 242 Neb. at 734, 496 N.W.2d at 916.

" 'Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises.' " *Hassing v. Wortman*, 214 Neb. 154, 160, 333 N.W.2d 765, 768 (1983).

Inasmuch as the record discloses that there exists no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the defendants are entitled to judgment as a matter of law, the summary judgments entered by the district court were correct. See *Howard v. Blue Cross Blue Shield*, 242 Neb. 150, 494 N.W.2d 99 (1993).

AFFIRMED.

HASTINGS, C.J., not participating.

WHITE, J., dissenting.

Although I believe that the Andreasens (at the very least, Mike and Tina) fall squarely within the analytical framework of *James v. Lieb*, 221 Neb. 47, 375 N.W.2d 109 (1985), and should thus be entitled to recovery, one need not even reach the application of those factors to find fault with the majority

opinion. Instead, I dissent because the majority has ignored this court's standard of review on an appeal from a summary judgment.

The decisions of this court are full of examples of the strict standard applied when we review a summary judgment. Summary judgment is to be granted only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose *that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts* and that the moving party is entitled to judgment as a matter of law.

A party moving for summary judgment has the burden to show that no issue of material fact exists and must furnish sufficient evidence to demonstrate that the moving party is entitled to judgment as a matter of law *if the evidence presented for summary judgment remains uncontroverted.*

Moreover, we have also frequently held that "[s]ummary judgment is an extreme remedy and should be awarded only when an issue is clear beyond all doubt." *State Farm Fire & Cas. Co. v. Victor*, 232 Neb. 942, 943, 442 N.W.2d 880, 881 (1989). Accord *American Community Stores Corp. v. Newman*, 232 Neb. 434, 441 N.W.2d 154 (1989).

The majority's holding flies squarely in the face of the preceding rules, denying the Andreasens any chance at trial when there was *at least* one issue of material fact in controversy—the severity of the emotional distress suffered by Mike and Tina.

Before turning to Mike and Tina's causes of action, I first address the majority's treatment of the Andreasen children's causes of action. Unless it is established that the parents did not suffer the required "severe" emotional distress (a fact I do not believe has been shown), it is of no moment that the children's distress was of a lesser degree than their parents'. Although the majority determines that the children's recovery is precluded because they were not "bystanders" within the meaning of *James*, this holding seems based on a factual finding, namely that these siblings of the deceased child, especially due to their young age, could not suffer great enough loss to be "foreseeable." I see no reason why the children could not, just

as easily, be considered as within the ambit of the *James* analysis.

Contrary to the majority's assertions, I believe that familial loss and grief (even among young children) are far too delicate and subtle to be decided by this court as matters of law. The foreseeability of the children's distress is a material issue of fact in controversy. Giving the children the benefit of all reasonable inferences from the evidence, I believe that this issue was inappropriate for summary judgment.

The preceding problem is magnified in the case of Mike and Tina's causes of action. The majority, faced with a material fact in controversy, simply makes a factual determination and denies the parents the benefits of a trial.

Admitting that both Mike and Tina qualify as bystanders, the majority focuses on the severity of their emotional distress, ultimately concluding that as a matter of law Mike and Tina did not present evidence showing they suffered an emotional injury sufficiently severe to withstand a motion for summary judgment. This statement runs directly contrary to the record. Following an evaluation of the Andreasens, a psychologist with a Ph.D. concluded that Mike and Tina had suffered from "*severe emotional distress.*"

The endurability of the distress suffered by a plaintiff is a question for the fact finder. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). The majority, however, disregards the evidence presented by the Andreasens, apparently feeling it appropriate to weigh, on appeal, the credibility of expert testimony.

The majority's choice of case law to bolster its holding is inappropriate. In both *Sell v. Mary Lanning Memorial Hosp.*, 243 Neb. 266, 498 N.W.2d 522 (1993), and *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 731, 496 N.W.2d 914 (1993), the two cases principally relied upon by the majority, the records contained *no* evidence of severe emotional distress. In addition, in *Parrish*, we stated: "To avoid a summary judgment in an action for emotional distress, the record must present *some* evidence establishing a factual question, i.e., . . . whether [the plaintiff's] reaction . . . is 'emotional distress' sufficiently severe and *medically significant* to be actionable under

Nebraska law." (Emphasis supplied.) 242 Neb. at 734, 496 N.W.2d at 916. The Andreasens, unlike the plaintiffs in *Sell* and *Parrish*, have made such a showing. I simply find no escape from the conclusion that at least one issue of material fact existed in this case, and thus, summary judgment was inappropriate.

Although the erroneous granting of summary judgment is sufficient to require a reversal of the district court's decision, I wish to take issue with one final point from the majority opinion, the contention that nightmares, headaches, loss of sleep, and nausea are, as a matter of law, insufficient indicators of severe or "extraordinary" emotional trauma to entitle the sufferer to recovery. If, as in this case, expert testimony corroborates the alleged severity of the distress suffered and there is evidence that the distress is a result of the defendant's negligence, it should be for the jury to decide whether the distress was so severe that no reasonable person could be expected to endure it. See, *Nichols, supra*; *Sell, supra*; *Parrish, supra*. The decision should not be made by an appellate court checking the plaintiff's symptoms against a laundry list of "sufficiently severe" manifestations of emotional trauma. A somewhat analogous point was raised by the dissent in *Sell*, in which Justice Lanphier noted that in certain limited instances, it is superfluous to require medical testimony about the depth of emotional trauma caused by an event when doing so ignores the obvious.

I reiterate my earlier point: Grief, sorrow, and emotional pain are far from predictable, uniform reactions. Thus, it should be the jury, persons not so "educated" in the antiseptic technicalities of the law, that should determine how much distress is reasonably endurable. Decisions such as *Sell* and the majority opinion in this case further remove the jury from this most important role. I fear that today's decision once again extends the rift between the decisions of this court and the realities of life.

It was this court that recognized a cause of action for emotional distress. See *Baylor v. Tyrrell*, 177 Neb. 812, 131 N.W.2d 393 (1964). If the majority wished, it could simply write the tort of negligent infliction of emotional distress out of

existence. However, since it did not do so, the decision today is not in accord with our previous cases. I respectfully dissent.

SHANAHAN AND LANPHIER, JJ., join in this dissent.

LANPHIER, J., dissenting.

I join in the dissent of Justice White except to the extent that Tina Andreasen could be considered a bystander. As a mother giving birth, she was a participant and not a bystander throughout the delivery. See *Westcott v. Mikkelson*, 148 Wis. 2d 239, 434 N.W.2d 822 (Wis. App. 1988), and *Haught v. Maceluch*, 681 F.2d 291 (5th Cir. 1982), which contemplate the nature of the relationship of a mother giving birth to her child. As stated in *Haught v. Maceluch*, 681 F.2d at 299:

> Not only was appellant located near the scene of the accident, she was in some sense the scene itself. Dr. Maceluch's negligent conduct was visited upon her and upon the child within her body; no closer proximity can be imagined. . . . [A]s a mother and child in childbirth their relationship was unitary.

In *Westcott v. Mikkelson, supra*, plaintiff mother sued for negligent infliction of emotional distress sustained during the delivery of her son, who was asphyxiated as a result of a wrapped umbilical cord. The court stated that "it is difficult to imagine a more clear-cut example of [a participant] than a mother giving birth to a child in distress." *Id.* at 242, 434 N.W.2d at 823.

In the present case, Tina, as a mother giving birth to her child, was an integral part of the procedure. She should not be relegated to the position of a bystander.

WHITE, J., joins in this dissent.